**Dorothy E. BROWN and Donald Lee Brown and United States National Bank of Oregon, etc., Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 23774.**

United States Court of Appeals, Ninth Circuit.

May 19, 1970.

[redacted]

[redacted]

Stephen B. Hill (argued) of Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for appellants.

Gilbert Andrews (argued), Johnnie M. Walters, Ass't. Gen., Lee A. Jackson, E. O. C. Ord, John M. Kirk, Tax Division, Dept. of Justice, Washington, D. C.; Sidney I. Lezak, U. S. Atty., Portland, Or., for appellee.

Before BARNES, ELY, and HUFSTEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

The residuary legatees of Clay Brown, deceased, appeal from a judgment of the district court denying their claim to a partial refund of income taxes for 1956.[1] At issue is the tax treatment of two blocks of stock that the decedent acquired pursuant to a stock option plan under the then applicable section 421 of the Internal Revenue Code (26 U.S.C. § 421).[2]

On October 28, 1954, Mr. Brown was elected president of M and M Woodworking Company ("M & M"), and shortly thereafter became a director. As a part

---

1. The district court's opinion is reported as Brown v. United States (D.Ore.1968) 292 F.Supp. 527.

2. Section 421 was substantially revised in 1964 and new §§ 422–25 concerning stock options were enacted. All references are to the original § 421.

of the resolution naming him president, Mr. Brown was granted a stock option for 10,000 shares of M & M stock of which 2,000 shares would be available for purchase on November 1, 1954, and the remainder in four blocks of 2,000 shares each on October 31, 1956 through 1959. The option price was $9.90 per share. Mr. Brown bought the first block of stock for that price on December 23, 1954.

On May 26, 1955, the board of directors revised the option plan, making the second block of 2,000 shares available for purchase on November 1, 1955, rather than on October 31, 1956. Mr. Brown exercised his option for the second block of shares on November 15, 1955, at $9.90 per share. On May 24, 1956, he expressly waived any rights to acquire further shares under his option.

On May 3, 1956, following negotiations between the management of M & M and that of Simpson Redwood Company ("Simpson"), M & M's board of directors approved a plan whereby Simpson would purchase all of M & M's assets, M & M would be liquidated, and its shareholders would be paid $35 per share. M & M's stockholders approved the plan at their annual meeting on June 21, 1956. Pursuant to that plan, Simpson deposited $50,536,186.61, the full purchase price of M & M's assets, to the account of M & M on August 17, 1956, and M & M concurrently put the money into an irrevocable escrow for distribution to its shareholders. The escrow agreement provided that distribution to each shareholder would be made only upon his surrender of his stock certificates. Over 96 percent of M & M's

stockholders surrendered their certificates and received their distributions from the escrow on August 17, 1956. Mr. Brown did not yield his certificates and receive payment therefor until December 12, 1956. M & M was thereafter dissolved.

In their 1956 joint income tax return, Mr. and Mrs. Brown reported their acquisition of the 4,000 shares under a restricted stock option and their disposition of the shares in 1956, two years after receipt of the option. Asserting the benefits of section 421 of the Code, the taxpayers reported receipt in 1956 of ordinary income in the sum of $6,880, representing the difference between the option price and the fair market value of the stock at the time the option was exercised [3] and the realization in the same year of long-term capital gain in the sum of $92,520, the difference between the fair market value of the stock at the time the option was exercised and the sale price. The taxpayers did not disclose in their return the revision of the stock option plan that was adopted by M & M on May 26, 1955.

The Internal Revenue Service disallowed capital gains treatment in respect of all gain realized from the disposition of both blocks of stock on the ground that the requisite two-year holding period was not met,[4] because a disposition within the meaning of section 421 occurred on August 17, 1956, the date the purchase money had been placed in the irrevocable escrow.

The Browns paid the deficiency assessment, a claim was filed on their behalf, and, after the claim for refund was rejected, this action was brought.

3. The option was one to which § 421(b) was applicable, because the option price was between 85 and 95 percent of the value of the stock at the time of the granting of the option.

4. Section 421(f) provided:
   "*Effect of Disqualifying Disposition.*—If a share of stock, acquired by an individual pursuant to his exercise of a restricted stock option, is disposed of by him within 2 years from the date of the granting of the option or within 6 months after the transfer of such share to him, then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occurred."

The district court decided that: (1) a disqualifying disposition occurred on August 17, 1956, because Mr. Brown had constructively received his share of the liquidation distribution on that date; (2) the May 1955 revision of the option was a "modification" of the plan, disqualifying the second block of shares from section 421 benefits, even if a disqualifying disposition had not occurred on August 17, 1956; and (3) taxpayers were estopped from asserting that the second block of shares had been acquired pursuant to a *non*-restricted stock option.

On appeal, the taxpayers do not challenge the second ground of the decision below.

We hold that a disqualifying disposition did not occur within the two-year holding period because the disposition was not made by the voluntary, affirmative act of Mr. Brown, as required by section 421, and that the taxpayers are not estopped from asserting the consequences of the modification of the stock option plan.

### 1. *No disqualifying disposition*

Were section 421 drawn simply to require "a disposition" of shares as the event upon which disqualification turned, we might agree with the Government that "a disposition" occurred when M & M reached agreement with Simpson for a sale and complete liquidation of M & M, and we would then have to decide whether or not the date of such disposition was the date upon which the liquidating payment was placed in escrow, or some other time. But the statute was not thus written.

The disqualifying event is not payment, actually or constructively received. The section 421 disposition is not just any disposition. The statute says not once, but repeatedly, that the disqualifying event is a "disposition of such share * * * *made by him* [the holder of the option] within 2 years from the date of the granting of the option." (Emphasis added.) We construe the terms "disposition * * * made by him" as manifesting Congress' intent that some affirmative, voluntary act of the option holder-taxpayer is required to constitute a disqualifying disposition. That Congress intended to focus upon the voluntary act of the individual executive is evidenced by the history of section 421. The statute was designed to give tax benefits to key corporate executives for the purpose, according to its proponents, of increasing corporate productiveness and thus stimulating the nation's economy. (S.Rep.No.2375, 81st Cong., 2d Sess., 1950 U.S.Code Cong. & Service, 3114–15; see H.R.Rep.No.749, 88th Cong., 1st Sess. (1963), 1964 U.S. Code Cong. & Ad.News, pp. 1313, 1375.) The incentive rationale is obviously no longer seved when the executive has chosen to dispose of his stock.[5]

The Government suggests that Mr. Brown took such affirmative action because (1) as President of M & M he negotiated the liquidation agreement on M & M's behalf, and (2) as a stockholder, he voted for the liquidation plan.

Nothing in the record supports even an inference that M & M or Simpson was acting as Mr. Brown's agent, or that either was subject to his control. Mr. Brown participated in the negotiations for sale in his fiduciary capacity, not in his capacity as a stockholder, and his actions as a fiduciary under these circumstances cannot be converted into actions on his individual behalf. (*Cf.* May

---

5. The Government argues that the rationale is no longer served when the corporation is liquidated, or indeed when any other form of involuntary conversion occurs. That argument ignores the possibility of *dis*-incentives arising from disqualification from § 421 in cases such as the one before us: an executive might be disinclined to accept an attractive take-over offer because of its unfavorable tax consequences to him personally. Moreover, § 421 specifically recognizes some involuntary conversions. For example, death of the option holder does not constitute a disqualifying disposition, and, indeed, the holder's estate may sell the stock immediately without loss of favorable treatment (§ 421(d) (6)).

*Rogers* (1935) 31 B.T.A. 994, 1004, aff'd (2d Cir. 1939) 107 F.2d 394; Rev.Rul. 67–405, 1967–2 Cum.Bul. 293).

■ The record does not support the district court's finding that Mr. Brown voted as a stockholder for the liquidation plan; the court's findings is clearly erroneous.[6]

It is unnecessary for us to decide whether or not Mr. Brown's act in surrendering his share certificates would have been an affirmative act constituting a disposition by him, because the act was not done before the expiration of the two-year holding period.

■ We hold that the involuntary exchange of Mr. Brown's stock pursuant to the liquidation plan and the irrevocable deposit of the liquidation payment to the escrow did not constitute a disqualifying disposition made by Mr. Brown, and we therefore hold that the district court erred in concluding that the first block of stock was disqualified from section 421 benefits.

### 2. *Effect of "modification"*

Our reversal of the district court's decision on the disposition issue requires our considering the alternative positions of the Government and of appellants in respect of the second block of 2000 shares.

The pretrial order embodied the Government's contention that, even if the first block of stock had not been sold

within two years of the date of the granting of the option, the second block had been thus disqualified because it was purchased pursuant to a "modification" of the plan adopted by M & M in May 1955. The district court found that the 1955 revision constituted a "modification" as defined in section 421(e)(2) of the Code [7] and in Treasury Regulation section 1.421–4(c)(1)(1958).[8]

Appellants contended that the 1955 revision of the stock option plan was merely a "clarification" of the plan, and not a "modification." They do not now contest the district court's contrary holding. Rather, they urge that the necessary result of that holding is that the second block of stock was acquired under a nonrestricted stock option plan. The "modified" plan could not have been a "restricted stock option," as that term is defined in section 421(d)(1), because the option price ($9.90) was less than 85 percent of the fair market value of the stock at the time the option was granted in May 1955 ($16). Therefore, appellants say, these tax consequences must follow: The difference between the option price and the fair market value of the stock at the time the nonrestricted stock option was granted should have been taxed as ordinary income in 1955, and the difference between the disposition price and the fair market value of the stock at the date Mr. Brown received the option should have been taxed as long-term capital gain in 1956, the year of disposition.[9] Collection of any taxes

6. Mr. Brown owned 4000 of M & M's 1,432,821 outstanding shares of stock. He was not one of the stockholders whose vote was recorded in the minutes, and there was no evidence that he voted by proxy. Only 1820 shares were voted against the liquidation plan, but there were 118,125 unvoted shares.

7. "The term 'modification' means any change in the terms of the option which gives the employee additional benefits under the option * * *." In 1964 Congress amended the definition of "modification" to provide that a mere acceleration of the time at which the option may be exercised is not a modification. 26 U.S.C. § 425(h)(3)(C).

8. "[A] change, which accelerates the time when the option is first exercisable, or which provides more favorable terms for the payment for the stock purchased under the option, is a modification."

9. This assumes that the option is one with a "readily ascertainable fair market value." Treas.Reg. § 1.421–6(c) (1959). Alternatively, Treas.Reg. § 1.421–6(d) might make the difference between the option price and the fair market value at the time of exercise taxable as ordinary income in 1955, the date of exercise, with the remaining gain taxable as capital gain in 1956. We do not decide this question, which was not discussed by the

that should have been paid in 1955 is now barred by the statute of limitations.

The district court did not reach the merits of these contentions for two reasons: (1) It decided the overriding "disposition" issue against the appellants, and (2) it accepted the Government's claim that appellants were estopped from asserting that the option was other than a restricted stock option. A third Government contention, not accepted by the district court, was that the appellants were bound by those theories of recovery raised in their claim for refund. (Ladd v. Riddell (9th Cir. 1962) 309 F.2d 51, 54; Treas.Reg. § 301.6402-2(b) (1956).[10]) We deal first with this third contention, still argued by the Government on appeal.

■ A taxpayer cannot recover at trial on a ground different from that asserted in his claim for refund unless there is some action by the Commissioner amounting to a waiver of the regulation. (Tucker v. Alexander (1927) 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253; Scharpf v. United States (D.Or.1956) 157 F.Supp. 434, 437, aff'd per curiam (9th Cir. 1957) 250 F.2d 744.) And it is true that Mr. Brown had not argued in his claim for refund that the second block of 2000 shares had been acquired pursuant to a nonrestricted stock option plan. But the Government waived its right to rely on the regulation by injecting the modification issue into the case. (See Mennen Co. v. Kelly (3d Cir.) 137 F.2d 866, on rehearing (1943) 137 F.2d 868.)

■ The Government first learned of the revision in its discovery prior to this suit. At that time it added the modification issue as an alternative defense. In response to that defense, appellants contended that the option, if modified as

the Government contended, would be nonrestrictive. It would be unfair to allow the Government to assert a new defense to a taxpayer's claim at pretrial and simultaneously to prevent the taxpayer from making appropriate responses to it, because the taxpayer had not previously anticipated the defense. The administration of the revenue system would not be enhanced by encouraging taxpayers to baloon their refund claims in attempts to anticipate every conceivable Government defense.

We reject the Government's estoppel argument on similar grounds. This is not a case in which the taxpayer, having deliberately misrepresented a material fact in his tax returns, later attempts to change his position to the detriment of the Government by asserting the true facts which he had originally obscured.[11] We can assume for purposes of this appeal that Mr. Brown's failure to report the 1955 revision was not an innocent mistake of law. Nevertheless, it was the Government, not appellants, who raised the issue. The Government chose to hedge the risk of losing on its principal contention on the disposition issue by asserting the modification claim as an alternative defense. Appellants cannot be foreclosed from responding to that defense and from asserting its legal consequences should the Government prevail. (Cf. Commission of Internal Revenue v. Estate of Donnell (5th Cir. 1969) 417 F.2d 106, 116; Fairmount Park Raceway, Inc. (1962) P-H Tax Ct. Mem. ¶ 62–014, at 80–81, aff'd (7th Cir. 1964) 327 F.2d 780; W. T. Wilson (1948) 10 T.C. 251, 259–60, aff'd (9th Cir. 1948) 170 F.2d 423, cert. denied (1949) 336 U.S. 909, 69 S.Ct. 514, 93 L.Ed. 1073; Agnes v. Russell (1940) P-H B.T.A. Mem. ¶ 40–371.)

district court; it is an appropriate matter for remand.

10. "No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period.

The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof."

11. Maguire & Zimet, Hobson's Choice and Similar Practices in Federal Taxation (1935) 48 Harv.L.Rev. 1281, 1294.

We decline to pass on the merits of appellants' claim that the 1955 modification resulted in a nonrestricted option, the consequences of which include the extent to which the statute of limitations bars recovery of taxes, if any, due in 1955. Nor do we pass on the Government's argument made below (but not then considered) that the mitigation provisions, sections 1311–15 of the 1954 Code (26 U.S.C. §§ 1311–15), allow for recovery of 1955 taxes otherwise barred. Nor do we consider whether the doctrine of equitable recoupment can be asserted as a Government defense to the refund claim, or whether appellants are estopped from asserting that the statute of limitations has run on 1955 taxes. The district court did not pass upon any of these questions, and, in the present state of the record, it is inappropriate for us to do so.

The judgment is reversed, and the cause is remanded for further proceedings consistent with the views herein expressed.