**Ronald J. BAYER et al.,**
**Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. C71–1126.**

United States District Court,
N. D. Ohio, E. D.

May 30, 1974.

Richard Katcher, Cleveland, Ohio, for plaintiffs.

Lawrence Ross, David Curtin, Tax Div., Dept. of Justice, Washington, D.C., Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, for defendant.

## MEMORANDUM

BEN C. GREEN, District Judge.

This is an action by plaintiffs seeking the sum of $22,104.45 refund on their joint federal income tax return for the year 1968. The essential question is whether certain income should be treated as ordinary income, as originally reported by plaintiffs, or as capital gains, as reported by plaintiffs on their amended return.

· The matter is now before the Court upon cross-motions for summary judgment, a stipulation of facts with exhibits having been submitted by the parties.

Mr. Ronald J. Bayer (hereinafter plaintiff) was, at all times relevant to

this proceeding, employed by the Pacific Coast Company (hereinafter Pacific). On September 17, 1964, Mr. Bayer was granted an option to purchase 3,000 shares of Pacific stock at $9.875 per share, pursuant to Pacific's Qualified Stock Option Plan which had been properly qualified under the Internal Revenue Code of 1954, 26 U.S.C. § 421 et seq.

On June 29, 1967, prior to plaintiff exercising his option, the Wall Street Journal announced through a news article that the chairman and owner of Pacific had offered to sell his 377,564 shares of stock in the corporation to an unnamed buyer for $32.00 per share. This represented almost 50 per cent of the outstanding shares of Pacific. The article also revealed that the purchase was conditioned on the unnamed buyer making an offer to the other shareholders of Pacific at the same $32.00 per share. On July 14, 1967, the Wall Street Journal identified the unnamed buyer as Noranda, Inc. (hereinafter Noranda). That article also stated that Noranda would offer $32.00 per share for all outstanding shares of Pacific within 45 days.

Twelve days later, on July 28, 1967, Bayer exercised his option for the purchase of 2,000 shares of Pacific, which was then trading on the American Stock Exchange at 31⅜ points.

On August 4, 1967, Noranda did make an offer to purchase all outstanding Pacific stock at $32.00 per share, and acquired 90 per cent of Pacific's outstanding shares under that offer. Plaintiff did not sell his 2,000 shares at that time, and on September 27, 1967, he exercised his option to acquire the remaining 1,000 shares. At that time the stock was trading at 23½.

It has been stipulated that:

On February 13, 1968, Bayer sold 2,000 shares of Pacific to Noranda pursuant to its offer to purchase at $32.00 per share.

Noranda transferred the shares of Pacific which it acquired to a wholly owned subsidiary, EDL, Inc., a Delaware corporation. On March 27, 1968, EDL, Inc.'s Certificate of Incorporation was filed in the office of the Secretary of State of the State of Delaware.

On April 18, 1968, Bayer received $32.00 per share for the remaining 1,000 shares of his option stock.

While it does not appear from the stipulation to whom plaintiff sold the stock, we can assume that the sale was to Noranda pursuant to its tender offer.

The stipulation then continues that:

In a letter dated April 19, 1968, Pacific advised its former shareholders of the merger of Pacific into EDL, Inc., effective April 18, 1968.

A copy of that letter is incorporated into the stipulation. The letter states that it is being sent pursuant to Section 253(d) of the General Corporation Law of the State of Delaware, and that:

The terms and conditions of the merger as set forth in the Certificate of Ownership and Merger provide for the payment by the surviving corporation of $32.00 per share net in cash without interest to the holder of each share of the outstanding Common Stock of the merged corporation not owned by the surviving corporation.

The letter then outlined the procedures for receiving payment under such offer, and the rights of shareholders not wishing to accept those terms. A dissenting shareholder had the right to have the value of his stock determined in a judicial proceeding. Copies of the merger agreement and pertinent Delaware statutes were appended as exhibits to the letter.

It thus appears that under Delaware law EDL had the right to call in all outstanding Pacific shares as a consequence of the merger, and had exercised that right by virtue of the letter of April 19, 1968.

The stipulation further states that:

In his 1968 income return [sic], Bayer reported as ordinary income $57,376, the difference between $29,625 (the option price of his 3,000 shares of Pa-

cific) and $87,001 (the alleged fair market value of the Pacific shares on the dates of exercise). Bayer also reported as long-term capital gain $8,999, the difference between $87,001 and $96,000, the tender offer price.

On or about September 18, 1970, Bayer filed on Form 1040–X a claim for refund of taxes of $18,537.35 resulting from a reclassification of the $57,376 gain from ordinary income to long-term capital gain.

In a 90-day letter dated March 31, 1972, the Internal Revenue Service asserted an additional deficiency in income taxes of $2,980.93.

On or about August 1, 1972, plaintiffs paid the deficiency of $2,980.93, and statutory interest of $586.17.

On or about February 8, 1973, plaintiffs filed a claim for refund on Form 843 for $3,567.10.

The question presented under the motions herein is whether the proceeds of the sale of plaintiff's shares of Pacific stock (retained for more than 6 months but less than 3 years) can be treated as capital gains.

Pursuant to 26 U.S.C. § 421, the transfer of a share of stock under a qualified option plan results in no income to the transferee, except as provided in Section 422(c)(1). In order to qualify under Section 421(a), the transaction must meet the requirements of Sections 422 (a), 423(a), or 424(a).

Section 421(b) provides that if a transfer pursuant to the exercise of an option fails to meet any of the holding period requirements of Sections 422(a) (1), 423(a)(1), or 424(a)(1), the transferee is charged with an increase in income for the year in which he disposes of the stock.

The statutory provisions regarding the holding periods are essentially as follows.

Section 422(a)(1) provides that in order to come within Section 421, no disposition may be made of the stock acquired under the option for a three-year period after the date of transfer. As

with Section 421(a), Section 422(a) is subject to Section 422(c)(1).

Section 423(a), which provides a different holding period, pertains to employee stock purchase plans which are not relevant to this case.

Section 424(a) applies to restricted stock option plans, which are not at issue herein.

Section 422(c)(1), which qualifies both Sections 421(a) and 422(a), contains special rules applicable to a number of particular contingencies. None of these contingencies has any bearing on this case.

Therefore, the issue comes down to whether plaintiff made a "disqualifying disposition" under Section 421(b), by failing to hold his stock for the three-year period called for in Section 422 (a).

Insofar as the matter of "disqualifying disposition" is concerned, the statutory definition of the term "disposition" must be considered. Section 425 (c) defines "disposition" as including "a sale, exchange, gift, or a transfer of legal title". The section also contains certain exemptions, not pertinent to this action, from the term "disposition".

The taxpayers argue that this sale of stock to Noranda was not a voluntary sale, but rather "forced upon [Bayer] by virtue of the provisions of the corporation laws of Delaware which empowered Noranda, Inc. unilaterally to terminate Ronald J. Bayer's equity participation in Pacific Coast Company by paying him cash." Thus, argue taxpayers, the so-called "forced sale" was not a disqualifying disposition under Section 421(b), taking into account the statutory definition of disposition as contained in Section 425(c). Therefore, continues the argument, capital gain treatment should have been allowed for the proceeds of the sale.

Plaintiff also argues that if the Court does not allow full capital gain treatment, such treatment should be given to $8,999.00 of the proceeds. This sum represents the difference between the total sale proceeds (which the govern-

ment maintains is ordinary income) and the over-the-counter value of the stock at the times plaintiff exercised his option to purchase the Pacific stock.

The government's position is that the entire transaction should continue to be treated as ordinary income in that "plaintiff's sales of his qualified stocks before the expiration of the required holding period is a disposition by him and as such it cannot be excused on the grounds that it was forced upon plaintiff by Noranda." As to the claim for capital gains treatment on the $8,999.00, the government contends that the fair market value of the Pacific stock should be considered to have been $32.00 per share on the dates when the options were exercised, as the Noranda tender offer was then public knowledge, so that all income would be ordinary income based on the differential between the option price and the $32.00 selling price.

Taxpayers have cited the case of Brown v. United States, 427 F.2d 57 (CA 9, 1970) for the proposition that an involuntary disposition of option stock made within the statutory holding period, is not a disqualifying disposition under Section 421 of the Internal Revenue Code, i. e., that the disqualifying event is not the disposition itself, but the voluntariness of it.

In the *Brown* case, the court construed the Section 421 language of "a disposition of such share . . . made by him" as meaning that such disposition must be voluntary. The court premised that conclusion on the following:

That Congress intended to focus upon the voluntary act of the individual executive is evidenced by the history of section 421. The statute was designed to give tax benefits to key corporate executives for the purpose, according to its proponents, of increasing corporate productiveness and thus stimulating the nation's economy [Citations omitted]. The incentive rationale is obviously no longer served when the executive has chosen to dispose of his stock. *Id.* at p. 60.

◼ Having reviewed the legislative history of the statutes in question, this Court is unable to agree with the conclusion in the *Brown* decision. This Court finds no indication in the legislative history that Congress considered the matter of voluntariness of a disposition within the statutory holding period as affecting the tax consequences to be afforded the proceeds of a sale.

As is the case with many provisions of the Internal Revenue Code, Section 425 is drawn in terms of a general rule, with specific exclusions therefrom. *See*, e. g., Commissioner v. Lo Bue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1953). Section 425, as previously noted, defines disposition as "a sale, exchange, gift, *or a transfer of legal title,*" the latter term encompassing virtually any divestiture of interest without qualification as to the voluntary or involuntary nature of such transfer. The definition then specifies two types of transfer, one type of exchange, and a mere pledge or hypothecation, each of which is not to be considered a disqualifying disposition. Of the excluded transactions, the two transfers are clearly involuntary in nature, being "a transfer from a decedent to an estate or a transfer by bequest or inheritance". The exchanges excluded from the statute could also be defined as involuntary, as it is related to exchanges arising from corporate reorganization. Therefore, the statute does take into account certain "involuntary" dispositions.[1]

◼ The primary source for determining legislative intent is the statute on its face. Minnesota Mining and Manufacturing Co. v. Norton Co., 366 F.2d 238 (CA 6, 1966). There is nothing in the statutory language to indicate that voluntariness is a factor in the legislative definition of "disposition". If anything, the broad language of the statute and

---

1. As to the exclusion of "a mere pledge or hypothecation", if such a revocable transfer of legal interest becomes final, then it does amount to a disposition under the statute. 26 C.F.R. § 1.425–1(c)(1)(iii).

the nature of the exclusions would indicate the contrary.

It is this Court's opinion that any sale, exchange, or transfer of legal title which does not fit one of the statutory exclusions is a disposition within the meaning of Sections 421 and 425. It therefore follows that plaintiff's sales of his option stock on February 13, 1968 and April 18, 1968 were dispositions within the statutory definition.

■ Assuming *arguendo,* that this Court were to adopt the rationale of the *Brown* decision, the result reached herein would remain unchanged. That is, if voluntariness were important, this Court would find that Mr. Bayer's acts were voluntary. The record is clear that during the time the tender offer was open, but prior to the issuing of the merger letter of April 19, 1968 (which event, argues plaintiff, left no other option but to sell), Mr. Bayer sold all his option stock to Noranda. While the ultimate result of the merger letter was that Bayer could have been forced to sell his option stock prior to the running of the holding period, it is nonetheless clear that his sales were made prior to the time that he was faced with that contingency. That is particularly true with regard to the February sale of the 2,000 shares. The Court has also noted, in relation to the voluntary nature of plaintiff's acts, that both sales were made shortly after the expiration of the general six-month holding period, necessary to qualify the sale as long-term capital gains.

This conduct on the part of Mr. Bayer distinguishes this case from the *Brown* action. In *Brown* the government had argued that the taxpayer's actions in approving certain steps leading to the ultimate sale of his stock constituted "affirmative" action rendering his sale voluntary. The Court rejected that argument as not supported by the facts on the record.

In conclusion, it is the Court's opinion that the plaintiff made a disqualifying disposition under Section 421(b) by failing to hold his stock for the three-year period specified in Section 422(a).

■ There remains the question as to whether plaintiff is entitled to capital gains treatment on the $8,999.00 portion of the proceeds. This issue is governed by what is determined as the fair market value of the stock at the times of its sale.

The over-the-counter price of 31⅜ at the time of the first sale is consistent with the outstanding $32.00 tender offer, and the variation is not sufficient to warrant rejection of the open market values.

At the time of the second sale, the stock was listed at 23½. The Court is at a loss to understand why the stock would be publicly traded at $23.50 per share, when the $32.00 per share tender offer was outstanding. Nevertheless, it is stipulated that the stock was being traded at that level, and the Court will accept that figure as representing the public's evaluation of the worth of the stock. The Court, therefore, has determined to adopt as the fair market value of the stock at the time of the second sale the over-the-counter value.

Based on the foregoing, plaintiff is entitled to capital gains on the $8,999.00 profit derived from the sales of his option stock.

The motions for summary judgment will each be granted in part and denied in part, in accordance with this memorandum. Counsel shall submit an agreed final judgment entry within thirty days hereof.