## NIAGARA MOHAWK POWER CORPORATION

v.

### The UNITED STATES.

### No. 248–73.

United States Court of Claims.

Oct. 22, 1975.

As Amended on Denial of Rehearing Jan. 9, 1976.

S. Hazard Gillespie, New York City, Atty. of record, for plaintiff; Wallace S. Jones, John A. Corry, Edmund S. Cohen, New York City, of counsel.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and BENNETT, Judge.

## ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Judge.

Plaintiff, Niagara Mohawk Power Corporation (Niagara Mohawk), seeks to recover an alleged overpayment of federal income tax and interest for its taxable years 1957–1962 in the amount of $27,-679,359. Defendant has moved for summary judgment as to that part of plaintiff's claim which asserts an entitlement to deductions, in those years, for obsolescence of certain water rights owned by plaintiff's predecessors as of March 1, 1913. In opposition to defendant's motion, plaintiff contends that there are issues of fact which preclude summary judgment on the legal issues. We consider the case upon the briefs and oral argument of counsel.

## I

Niagara Mohawk is a publicly held New York corporation engaged in the sale of electric power and natural gas in upper New York State. During the period 1881 through 1961, Niagara Mohawk and its predecessors operated hydroelectric plants at Niagara Falls which generated electrical power through diversion of water from Niagara River.

Plaintiff's use of the water during the period relevant herein was subject to both state and federal law. Under New York State law plaintiff's right to use the water (coupled with an obligation to return the water to the river) was a recognized property right—more specifically, a form of real estate known as a corporeal hereditament. *See Federal Power Comm'n v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 246–47, 74 S.Ct. 487, 98 L.Ed. 686 (1954). The parties agree that prior to enactment in 1957 of Pub.L. 85–159, 71 Stat. 401 (to be discussed below), plaintiff's water rights were of indefinite duration.

Federal regulation of plaintiff's water rights began with passage of the Federal Water Power Act of 1920, ch. 285, 41 Stat. 1063. The plan of the Act was one of "reasonable regulation of the use of navigable waters, coupled with encouragement of their development as power projects by private parties." *Federal Power Comm'n v. Niagara Mohawk Power Corp., supra* at 251, 74 S.Ct. at 494. The Supreme Court held in the above-cited case that the Act did not abolish private proprietary rights such as plaintiff's, existing under state law, to use the waters of navigable streams for power purposes.[1] Pursuant to the Act plaintiff's predecessor secured from the Federal Power Commission in 1921 a federal license, for a term of 50 years, authorizing diversion of water from the

---

1. "The Act treats usufructuary water rights like other property rights.. While leaving the way open for the exercise of the federal servitude and of federal rights of purchase or condemnation, there is no purpose expressed to seize, abolish or eliminate water rights without compensation merely by force of the Act itself. [Footnote omitted.]

"The references in the Act to preexisting water rights carry a natural implication that those rights are to survive, at least until taken over by purchase or otherwise. [Footnote omitted.] Riparian water rights, like other real property rights, are determined by state law. Title to them is acquired in conformity with that law. The Federal Water Power Act merely imposes upon their owners the additional obligation of using them in compliance with that Act." [*Federal Power Comm'n v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 251–52, 74 S.Ct. 487, 494 (1954).]

Niagara River. A treaty[2] between the United States and Great Britain, relating to boundary waters between the United States and Canada, limited the diversion to 20,000 cubic feet per second (c.f.s.).

In 1950 the United States and Canada entered into a new treaty which substantially increased the amount of water each country was permitted to divert. For the United States the permitted diversion was increased from 20,000 c.f.s. to 65,000 c.f.s. In approving the treaty, the Senate reserved the right to designate the entity which would redevelop the United States share of water. Such designation was however, delayed for several years while Congress debated whether the redevelopment should be undertaken by a private concern or by the Power Authority of the State of New York (PASNY).

Plaintiff had originally supported a plan under which it would have participated in the redevelopment, but plaintiff altered its thinking after a series of rockslides on June 7, 1956, crushed the larger of plaintiff's two hydroelectric plants and swept it into the Niagara River. Plaintiff's generating capacity had suddenly been reduced by 80 percent. Following the rockslide, plaintiff believed that public redevelopment was inevitable and that plaintiff's continued opposition could only delay that redevelopment at that cost of considerable damage to plaintiff's goodwill. It was feared that delay would drive industry from the Niagara Falls area and deter potential customers from locating in other geographic regions to which Niagara Mohawk provided power. Yet, plaintiff needed a permanent source of power to compensate for the loss brought about by the rockslide. Consequently, on April 10, 1957, in a prepared statement, plaintiff's president told a Senate subcommittee that plaintiff would surrender its license and water rights in return for specific legislative assurance that plaintiff would be able to purchase from PASNY power equivalent to the power generated by plaintiff prior to the rockslides:

> We have indicated to the power authority that, upon fair terms, we would surrender not only our license and our rights thereunder, but all our riparian and other water rights and claims for compensation or damages, except just compensation for tangible property actually taken. This would mean, of course, that we would cease to generate power at our Adams plant and in our restored units in the Schoellkopf plant.
>
> In return for the surrender of these rights, under the provisions of S. 1037, from the 750,000 kilowatts to be generated by the power authority with the water we now utilize, Niagara Mohawk would purchase 445,000 kilowatts, the equivalent of the amount produced by us in the licensed project prior to the Schoellkopf disaster. We would purchase this amount of power for the period ending on the final maturity date of power authority bonds issued to finance the project. We would pay for the power on the same terms as will be available to other purchasers of power from the authority. Under the bill, the 445,000 kilowatts of power would be sold to Niagara Mohawk for the same general purposes for which power from our licensed project was utilized and, as the bill recites, "in order to restore as nearly as possible low power costs." Further, under the bill, the power authority's contract with us would require the approval of the governor of the State of New York. [*Hearings Before a Subcomm. of the Senate Comm. on Public Works on S. 512 and S. 1037*, 85th Cong., 1st Sess., pp. 181–82 (1957).]

Congress thereafter, on August 21, 1957, enacted Pub.L. 85–159, 71 Stat. 401, authorizing the Federal Power Commission to license PASNY to undertake the Niagara redevelopment project on

---

2. 36 Stat. 2448, proclaimed May 13, 1910.

certain conditions. One condition was that PASNY contract to sell plaintiff, for a prescribed period, the amount of power (445,000 kw.) previously generated by plaintiff, for resale to the industries which purchased power from plaintiff's Niagara project prior to June 7, 1956. In order to obtain the contract, however, the Act required plaintiff to surrender its license and "waive all claims to compensation or damages based upon loss of or damage to riparian rights, diversionary rights, or other rights relating to the diversion or use of water, * * *." 71 Stat. at 402.

Pursuant to the Act, PASNY and Niagara Mohawk entered into a contract dated February 10, 1961. The contract provided for the sale of the 445,000 kw. of replacement power referred to in the Act, for the period ending January 1, 1990, or at the election of taxpayer, for the period ending January 1, 2006. The contract also provided for the sale of an additional 745,000 kw. of power through January 1, 1990. All provisions of the Act were incorporated into the contract by reference. Niagara Mohawk surrendered its license on October 1, 1961.

On the theory that its water rights had been rendered obsolete by the enactment of Pub.L. 85–159, plaintiff deducted from income the alleged value of these water rights over the period 1957–1962. These deductions were disallowed. Plaintiff paid the deficiencies with interest on October 31, 1972, and on February 5, 1973, plaintiff filed claims for refund. When no refund was forthcoming within the 6 months allowed by law, plaintiff on August 8, 1973, filed its petition in this court.

In its motion for partial summary judgment defendant asserts, for the first time in this litigation, that plaintiff's waiver of its water rights in return for the contract with PASNY was a taxable exchange of property subject to sections 1001 and 1002 of the Internal Revenue Code of 1954. Defendant then argues

that plaintiff incurred no loss on the exchange.[3] In reply, plaintiff states that if the transaction is properly viewed as an exchange, then plaintiff did suffer a substantial loss on that exchange.

## II

■ If there are disputed material factual issues which must first be resolved on the merits, then we cannot grant defendant's motion for summary judgment. Rule 101(d). Plaintiff alleges that there are four such issues.

■ First, says plaintiff, there is the issue of Niagara Mohawk's motive for withdrawing opposition to legislation authorizing public redevelopment at the Niagara River. While we doubt the relevance of this "issue," it has in any case been mooted because defendant has accepted, for purposes of its motion, the motive claimed by plaintiff, i. e.:

> * * * following the rockslide, plaintiff believed that the enactment of such legislation was inevitable and that Niagara Mohawk's continued opposition could only delay its passage at the cost of considerable damage to plaintiff's goodwill.

■ The second asserted factual issue is whether Niagara Mohawk exchanged its water rights for the contract with PASNY. There is, however, no genuine issue here. The contract, which incorporates Pub.L. 85–159, shows that an exchange was made. No testimony can alter the transaction clearly set out in those documents.

■ Thirdly, plaintiff argues that the value of its contract with PASNY is in dispute. This is no doubt so, as defendant would likely assign it a higher value than would plaintiff, if the need for valuation arose. But resolution of this factual issue, if it becomes necessary at all is required only *after* the legal issues raised herein by defendant's motion are decided. It is thus no barrier to consideration of defendant's motion.

---

3. The possibility that plaintiff realized a gain on the alleged exchange need not be considered herein because the Internal Revenue Service did not on audit include any amount in income for 1961 on account of the exchange.

Finally, plaintiff argues that the cost of plaintiff's water rights is disputed. As with the previous issue—that involving the value of plaintiff's contract with PASNY—this issue comes into play, if at all, only after the legal issues presented herein have been decided.

There are thus no issues of fact to impede our consideration of defendant's motion, to which were now turn.

### III

Plaintiff's primary claim is that it is entitled to take deductions for depreciation of its water rights over the period 1957–1962. Plaintiff relies on section 167(a) of the Internal Revenue Code of 1954, which states:

(a) *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

It is plaintiff's theory that the enactment of Pub.L. 85–159 in 1957 rendered Niagara Mohawk's water rights obsolete by establishing a date after which Niagara Mohawk would no longer be able to utilize them. Plaintiff suggests that, while prior to Pub.L. 85–159 the water rights had an indeterminate life and therefore could not be depreciated, the enactment of Pub.L. 85–159 limited and thus defined their useful life. We find this claim to be without merit.

■ The useful life of an asset is the period over which the asset may reasonably be expected to be useful in the taxpayer's trade or business. Treas.Reg. § 1.167(a)–1(b) (1962); *Massey Motors, Inc. v. United States,* 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960); *Pennsylvania Power & Light Co. v. United States,* 411 F.2d 1300, 188 Ct.Cl. 76 (1969). This period is to be determined by reference to the taxpayer's experi-

ence, unless that experience is inadequate, in which case the general experience of the industry may be used. Treas.Reg. § 1.167(a)–1(b) (1962). By either of these criteria, the useful life of plaintiff's water rights was indeterminate. Like land, which is by regulation[4] nondepreciable, water rights do not wear out. It will be recalled that under New York State law, plaintiff's water rights were classified as a form of real estate.

■ More to the point, however, plaintiff has not demonstrated that Pub.L. 85–159 rendered its water rights obsolete. Indeed, it cannot. The same water rights enjoyed by plaintiff until 1962 are now owned and put to use by PASNY. The water rights did not become obsolete; they were simply transferred or given up to another user. The water rights continue to have an indeterminate useful life in the hands of PASNY.

■ Useful life of an asset is the period of usefulness in taxpayer's business, not a lesser period during which taxpayer chooses to use the asset before transferring it to another user. A claim similar to plaintiff's was made in *Hilaire P. Coussement,* 25 T.C.M. 930 (1966), *aff'd,* 391 F.2d 227 (6th. Cir. 1968). There the taxpayer sought to depreciate a building held for rental purposes based on a useful life of 20 years, because 20 years was his life expectancy, and he reasoned that the building would therefore be useful to him for only that period of time. The Tax Court dismissed his claim, stating:

There is no merit in such a bizarre suggestion. The useful life of rental property for depreciation purposes is not based on the life expectancy of the owner. We hold for respondent.

Similarly, the useful life of the water rights is not to be measured by plaintiff's period of use.

Obsolescence cases cited by plaintiff do not support its position. *V. Loewers Gambrinus Brewery Co. v. Anderson,* 282

---

4. Treas.Reg. § 1.167(a)–2 (1962).

U.S. 638, 51 S.Ct. 260, 75 L.Ed. 588 (1931), and *Burnet v. National Indus. Alcohol Co.,* 282 U.S. 646, 51 S.Ct. 265, 75 L.Ed. 592 (1931), involved property used in the manufacture and sale of beer, ales, and porter, which property was rendered obsolete by prohibition. The property was not commercially adaptable for any other use, or, in the *Burnet* case, was reduced to a fraction of its earlier value. In contrast, the water rights which plaintiff seeks to depreciate did not become less valuable and were not forced into disuse. They are used to this day. Only plaintiff's use ended in 1961. *Gulf Coast Irrigation Co.,* 24 B.T.A. 958 (1931), is inapposite for the same reasons.

## IV

■ Insofar as the water rights under discussion are concerned, plaintiff's application for refund to the Internal Revenue Service was based solely on the obsolescence argument which has been found meritless. Normally, this would conclude our discussion, for, as we stated in *Union Pac. R. R. v. United States,* 389 F.2d 437, 442, 182 Ct.Cl. 103, 108 (1968),

> [i]t is an undisputed general rule that a ground for refund neither specifically raised by, nor comprised within the general language of, a timely formal or informal application for refund to the Internal Revenue Service cannot be considered by a court in which a suit for refund is subsequently initiated. * * *.

*See also J. O. Johnson, Inc. v. United States,* 476 F.2d 1337, 201 Ct.Cl. 315, *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973). Nevertheless, the general rule is subject to an important exception—one which we think is applicable here—namely, that the Government can waive the requirement. *Tucker v. Alexander,* 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253 (1927); *Bear Valley Mutual Water Co. v. Riddell,* 493 F.2d 948 (9th Cir. 1974); *Brown v. United States,* 427 F.2d 57 (9th Cir. 1970); *Mennen Co. v. Kelly,* 137 F.2d 866 (3d Cir. 1943);

*Red River Lumber Co. v. United States,* 139 F.Supp. 148, 134 Ct.Cl. 444 (1956).

In the instant case, defendant has introduced in its motion for summary judgment a defense to plaintiff's obsolescence claim which was not previously raised by the Government in denying plaintiff's claim at the administrative level, and which was not anticipated by any of plaintiff's submissions prior to defendant's motion. The defense thus raised for the first time is that plaintiff's waiver of its water rights in return for the contract with PASNY was a taxable exchange of property subject to sections 1001 and 1002 of the Internal Revenue Code of 1954. Defendant not only carefully sets out in its motion the elements of the exchange, but, in apparent anticipation of plaintiff's reply, argues in detail that plaintiff did not suffer a loss on the exchange for which a deduction could be taken. It comes as no surprise that plaintiff, it its reply, argues that if the transaction is to be viewed as an exchange, then plaintiff suffered a loss on the exchange.

■ Defendant did not need to introduce this new defense in order to rebut plaintiff's obsolescence argument. Apparently it did so because it felt its overall defense was thereby strengthened, even though it might have to litigate the loss-on-the-exchange issue as a result. This is a waiver by defendant, and plaintiff is entitled to have this new issue decided. Our decision in this matter is consistent with that of *Brown v. United States, supra,* whose holding was recently described by that court to be as follows:

> * * * the government, by interjecting a defense at trial different from that relied on in disallowing the claim, waived its right to object to the taxpayer's response, which advanced a ground for recovery different from that set out in the claim for refund, but which was based on the government's new position. * * *. [*Bear Valley Mutual Water Co. v. Riddell, supra,* 493 F.2d at 952.]

■ We agree with defendant that plaintiff's water rights were exchanged for the contract rights to receive power from PASNY. We must therefore determine whether plaintiff suffered a loss on the exchange.

## V

Defendant argues that as a matter of law plaintiff incurred no loss on the exchange because Niagara Mohawk's basis in the water rights for determining loss was zero. Plaintiff, on the other hand argues that it had a substantial basis for loss in the water rights. The dispute breaks down into two issues. The first is whether the basis is to be measured by the cost of the water rights to plaintiff and its predecessors, which defendant contends was zero, or whether, as plaintiff contends, the basis for loss was the fair market value (f.m.v.) as of March 1, 1913. The second issue, reached only if defendant carries the day on the first, is whether the cost of the water rights was zero or an amount equal to f.m.v. of the water rights on June 3, 1910. We proceed to the first issue.

## (1)

■ The parties agree that the basis for determining loss of property exchanged in a particular tax year is governed by the revenue law applicable to that year. Int.Rev.Code of 1954, § 1011. Since the exchange in question took place in 1961, the applicable provisions are those of the 1954 Code. We conclude that the 1954 Code requires that plaintiff's basis be measured by cost, not f.m.v. as of March 1, 1913.

Section 1012 [5] of the 1954 Code states that the "basis of property shall be the cost of such property, except as otherwise provided" elsewhere in the Code. The Code does contain another provision which is applicable, namely, section 1052(c). That section provides:

(c) *Internal Revenue Code of 1939.* —If the property was acquired, after February 28, 1913, in a transaction to which the Internal Revenue Code of 1939 applied, and the basis thereof, for purposes of the Internal Revenue Code of 1939, was prescribed by section 113(a)(6), (7), (8), (13), (15), (18), (19), or (23) of such code, then for purposes of this subtitle the basis shall be the same as the basis therein prescribed in the Internal Revenue Code of 1939.

Section 1052(c) is applicable first because Niagara Mohawk acquired the water rights from predecessor Niagara Falls Power Company in a tax-free merger in 1950, and thus the transaction was governed by the Internal Revenue Code of 1939. It is applicable also because the basis of the property (water rights) acquired in the merger was prescribed by section 113(a)(7) of the 1939 Code, which provides:

(7) *Transfers to corporation. If the property was acquired—*

(A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them, or

(B) *in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization,* then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply

---

5. "§ 1012 *Basis of property—cost*

"The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P

(relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer."

if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer. [Emphasis supplied.]

Section 113(a)(7)(B) thus directs that the basis for plaintiff is the same as it would have been for predecessor Niagara Falls Power Company, if Niagara Falls had owned the water rights in 1961. Under the 1954 Code that basis would be cost (see section 1012) unless another provision applied. Again, however, section 1052(c) does apply. It applies because Niagara Falls Power Company, plaintiff's predecessor, in turn acquired the water rights in 1918 in a tax-free consolidation with other companies. The basis of the water rights acquired was prescribed, during the 1939 Code years, by section 113(a)(7) of the 1939 Code, quoted above. Section 113(a)(7)(A) thus directs that the basis for plaintiff is the same as it would have been if the pre-1918 entities had owned the water rights in 1961. Under section 1012 of the 1954 Code, that basis is cost.

To arrive at a result other than cost, plaintiff relies on section 113(a)(12) of the 1939 Code in conjunction with various provisions of prior Revenue Acts. Taken together, these statutes in plaintiff's view lead to the conclusion that the basis of each of its predecessors in the water rights—and therefore its basis under applicable carryover rules—was f.m.v. as of March 1, 1913.

Section 113(a)(12) of the 1939 Code does not apply in the decision which we enter today. As stated above it is the 1954 Code which is controlling. That Code prescribes cost as the basis unless another section of the 1954 Code otherwise provides. Section 1052(c) does *not* refer to section 113(a)(12) of the 1939 Code. Thus, if plaintiff were correct in arguing that section 113(a)(12) of the 1939 Code, rather than section 113(a)(7), prescribed the basis of the water rights under that Code, then section 1052(c) of

the 1954 Code simply would be inapplicable. In such a case, sections 1012 and 362(b) (the latter section providing for a carryover basis of property acquired in a tax-free reorganization) of the 1954 Code control and lead to the same result— namely, that plaintiff's basis is the cost of the water rights to its pre-1918 predecessors.

(2)

The cost of the water rights, defendant says, was zero, and in the conventional use of the term "cost" defendant is correct, for there is no allegation that the water rights were originally purchased for a sum of money or for property. However, plaintiff argues that at least a portion of the water rights did have a cost for tax purposes, arising out of a merger which was consummated on June 3, 1910.* That cost is alleged to be the f.m.v. of the water rights on the date of the merger, estimated by plaintiff to be $15 million.

The mechanics of the merger are as follows: Prior to 1910 the Niagara Falls Hydraulic Power and Manufacturing Co. (Manufacturing) exercised certain water rights at Niagara Falls subject to regulation by the New York Public Service Commission. In 1909 the Cliff Electric Distributing Co. (Cliff) was set up so that Manufacturing could transfer certain property, not including the water rights, to it. In return for the property assets, Manufacturing received all of Cliff's stock plus bonds. Subsequently, on March 25, 1910, the Hydraulic Company of Niagara Falls (Hydraulic) was incorporated with the same proprietary interests as Manufacturing. Hydraulic issued $2.5 million in bonds and $12 million par value of stock. On June 3, 1910, Manufacturing was merged into Hydraulic, the latter exchanging its $14.5 million in securities for the $500,000 of stock of Manufacturing. Manufacturing's assets, including its water rights, thereby became the property of Hydraulic. It appears that the book cost of the assets acquired from Manufacturing was

increased by $11,800,482.24 as a result of this merger, at least in large part because of value assigned to the water rights.[6]

Plaintiff relies on the literal language of the Code and on very similar cases of the Tax Court which uphold its view. Defendant argues that to permit the water rights to acquire a cost through the merger is to elevate form over substance contrary to reasoned administration of the tax laws. In this admittedly close question, we conclude that plaintiff should prevail.

■ We have seen that by virtue of section 1012, and either section 1052(c) or section 362(b) of the 1954 Code, plaintiff's basis in the water rights was the cost of those rights to Hydraulic. Hydraulic acquired the rights in the 1910 merger as one of the properties formerly held by Manufacturing. Treas.Reg. § 1.1012(1)(a) (1962) states that the cost of property is "the amount paid for such property in cash or other property." Thus, the cost of the water rights to Hydraulic was some part of the value of the $14.5 million in securities paid to Manufacturing.[7] It is quite possible, as plaintiff states, that the value of the stock paid for the water rights will have to be in turn measured by the f.m.v. of the water rights. Cf. Rev.Rul. 55–443, 1955–2 Cum.Bull. 562. We need not decide here what the cost was, however; we only decide that the water rights had a cost.

The Tax Court has come to the same result in very similar cases. In *Maltine Co.,* 5 T.C. 1265 (1945), *acquiesced in,* 1946–1 Cum.Bull. 3, the issue was whether the taxpayer was entitled to an equity invested capital credit for intangible assets acquired from another corporation in 1898. Under the applicable Code provision, the taxpayer was entitled to the credit in an amount equal to its basis for determining loss upon a sale or exchange. The intangible assets—patents, trademarks, and goodwill—had been written up in book value in the 1898 transaction which, like our own, had involved two corporations owned by the same stockholders. The Tax Court noted that if the transaction had occurred in later years, it would have qualified as a tax-free reorganization in which case taxpayer would have been required to use its transferor's basis. Nevertheless, the court approved the use of the stepped-up basis on the grounds that the statute required it and that it was up to Congress to fashion an exception for this case, if it so desired. The court was not swayed by the Government's contention, similar to that being made in the instant case, that the transaction was but the "write up" of goodwill and the declaration of a stock dividend.

The case of *I. Lewis Corp.,* 22 T.C.M. 35 (1963), dealt with whether taxpayer corporation had suffered a loss in 1954 because of abandonment of certain trademarks, patents, and brand names acquired in 1910 from a sole proprietorship. In 1910 the corporation had purchased all assets, and assumed all liabilities, of the sole proprietorship; in return the sole proprietorship received stock of the corporation. On its books the corporation valued the trademarks, etc., at $2.6 million though they had not been listed as assets on the proprietorship books. The Tax Court approved the stepped-up basis, stating at 43–44:

Respondent argues that the amount of loss is to be limited by Israel Lewis' basis in the abandoned brands. His argument is that no transferee ever receives a higher basis for assets received in a transfer unless the transferor recognizes gain on the transfer. Although the 1910 transfer was by its

---

6. *See Niagara Falls Power Co.,* 3 F.P.C. 206, 222 (1942).

7. We see no significance in the fact that Hydraulic exchanged securities for Manufacturing's stock rather than its assets. The result was the same, *i. e.,* Hydraulic acquired all of the assets. *Cf. Kimbell-Diamond Milling Co.,* 14 T.C. 74 (1950), *aff'd,* 187 F.2d 718 (5th Cir. 1951), *cert. denied,* 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951).

very date nontaxable, respondent argues that it would have been nontaxable if occurring between March 1, 1913, and December 31, 1920. [Footnote omitted.] * * *.

Since Israel Lewis, as an individual, could not under any circumstances be subject to any personal income tax in 1910, we cannot accept respondent's argument, intriguing though it may be. Also, we find no provision in the Internal Revenue Code overriding section 1012, and thus petitioner's basis in the abandoned brands is its cost, measured by the fair market value of its stock issued therefor, or in the absence of any market value, the value of the brands transferred.

We are not unmoved by defendant's assertion that the "change in form," which the 1910 merger was for many purposes, should not affect the basis of the water rights. Ignoring the separate corporate entities, it might be said that by purchasing the water rights from itself, plaintiff created a cost for those water rights. While plaintiff is thus receiving the benefit of a fortuitous event, it is nevertheless clear that there was no tax avoidance motive, because there was no tax. The merger was thus done for business reasons—no doubt primarily to alter the capital structure of the business.

Congress could have provided an exception to section 1012 to meet the circumstances presented here, but has not done so. We conclude that plaintiff is entitled to a literal application of the Code.

 This decision does not, of course, assure a recovery by plaintiff in this court for loss on the exchange of the water rights. Plaintiff must prove the amount of its basis in the water rights as well as the value of the contract with PASNY received in exchange. If the contract with PASNY had a value equal to or greater than plaintiff's basis in the water rights, plaintiff has not suffered a loss.

Defendant's motion for partial summary judgment is denied. The case is remanded to the Trial Division for further proceedings consistent with this opinion.