**UNITED NUCLEAR CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 223–84L.**

United States Claims Court.

March 19, 1987.

Peter J. Nickles, Washington, D.C., attorney of record for plaintiff; J. Rosenbaum, Covington & Burling, G. Stanley Crout, C. Mott Woolley, and Stephenson, Carpenter, Crout & Olmsted, of counsel.

Alan Brenner, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

NAPIER, Judge:

This case involves a suit filed by plaintiff under 28 U.S.C. § 1491 (1982) alleging a Fifth Amendment "taking" by inverse condemnation. The defendant has now filed a motion it styles as a motion to dismiss. After the motion to dismiss was filed, matters outside the pleadings were presented to and not excluded by the Court.

Rule 12(b)(4) RUSCC provides that where material beyond the pleadings is presented to and not excluded by the Court, a motion to dismiss shall be treated " * * * as one for summary judgment and disposed of as provided in Rule 56 * * *."[1] However, under the Rule, that portion of the motion which addresses the Court's subject matter jurisdiction remains a motion to dismiss. RUSCC 12(b); 5 Wright and Miller, *Federal Practice and Procedure:* Civil § 1366 (1969).[2]

After oral argument and careful review of the briefs, supporting memoranda and

---

1. Rule 12(b) states:
   Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) insufficiency of process, (4) failure to state a claim upon which relief can be granted. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert at the trial any defense in law or fact to that claim for relief. *If, on a motion asserting the defense numbered (4) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.* [Emphasis added.]

   Further Rule 8(c) RUSCC provides as follows:
   *In pleading to a preceding pleading, a party shall set forth affirmatively* accord and satisfaction, arbitration and award, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, res judicata, statute of frauds, *statute of limitations,* waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation. [Emphasis added.]

2. A motion to dismiss based upon an affirmative defense is to be resolved by summary judgment standards if it relies upon matters outside the pleading. 5 Wright & Miller, *Federal Practice and Procedure:* Civil, § 1366 at p. 683–84 (1969). Therefore, the standards for deciding the various portions of the original motion are as follows: (1) that portion of defendant's motion to dismiss which pertains to the statute of limitations is converted to a summary judgment motion under Rule 12(b) RUSCC; (2) that portion of defendant's motion to dismiss which addresses the Court's subject matter jurisdiction over the subject claim remains a motion to dismiss; (3) that portion of defendant's motion to dismiss for failure to state a claim upon

relevant case law, the Court concludes that it has jurisdiction over the subject matter, that there are issues of material fact which remain in dispute and defendant is not entitled to judgment as a matter of law. Both that portion of the motion to dismiss under Rule 12(b) RUSCC and the converted portions of the motion for summary judgment under Rule 12(b)(4) RUSCC and Rule 56 RUSCC are, therefore, denied.

## FACTS

The plaintiff, United Nuclear Corporation (UNC), is a corporation organized under the laws of the State of Delaware. In April and May 1971, the Secretary of the Interior and his agents determined to lease various tracts of land on the Navajo Reservation in New Mexico on behalf of the Navajo Indian Tribe. To this end, the Secretary issued an invitation for sealed bids. UNC was the successful bidder for two tracts of land, and on June 29, 1971, entered into two leases with the Navajo Indian Tribe which permitted the plaintiff to mine for certain minerals including uranium ore on lands of the Tribe near Gallup, New Mexico. The primary term of the leases extended for "a term of 10 years from the date of * * * approval and as long thereafter as the minerals specified are produced in paying quantities." On July 7, 1971, pursuant to statutory authority,[3] the Secretary of the Interior approved the mineral leases entered into between UNC and the Navajo Tribe.[4]

UNC paid the Navajo Tribe an initial bonus of seventy-nine thousand ($79,000) dollars for the leases. In addition, UNC agreed to pay royalties to the Tribe ranging from 12 percent to 25 percent, depending upon the richness of the ore. Further, the lease agreements committed UNC to paying rental fees annually and minimum royalties annually beginning in the fourth year of the leases. As of June 1981, UNC had paid the Navajo Tribe over $220,000 under these lease provisions.

Subsequent to the approval of the leases by the Secretary of the Interior, UNC submitted and received approval from the Secretary of an exploration plan as required by regulation.[5] UNC explored for and discovered valuable deposits of uranium ore on the leased lands. By July 1976, it had completed more than 800 test holes at a cost in excess of $10,000 per hole and its total exploration expenditures ultimately reached nearly $10 million. As a result of this exploration, UNC discovered sizable uranium reserves.

On February 24, 1977, as required by regulation,[6] UNC submitted to the United States Geological Survey (USGS), a Bureau of the Department of the Interior, for approval, a mining plan for mining operations on the leased lands. The mining plan satis-

---

which relief can be granted was converted to a summary judgment motion and is dealt with under the standards of Rule 56 RUSCC.

**3.** 25 U.S.C. § 81 states in pertinent part:
No agreement shall be made by any person with any tribe of Indians * * * for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him * * * unless such contract or agreement be executed and approved as follows: * * *
Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
25 U.S.C. § 396a states in pertinent part:
* * * lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction * * * may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms

not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

**4.** Subsequent to entering into the leases, UNC assigned one-half of its leasehold interest to the Tennessee Valley Authority (TVA). TVA is not a party to this action.

**5.** *See* 25 C.F.R. § 177.6 (1977), Approval of Exploration Plan, which states in pertinent part:
(a) Before commencing any surface disturbing operations to explore, test or prospect for minerals, the operator shall file with the mining supervisor a plan for the proposed exploration operations.

**6.** *See* 25 C.F.R. § 177.7 (1977), Approval of Mining Plan, which states in pertinent part:
(a) Before surface mining operations may commence under any permit or lease, the operator must file a mining plan with the mining supervisor and obtain his approval of the plan.

fied each of the requirements set forth in the mining plan regulations.[7] However, the Department of the Interior withheld approval of the mining plan for a period of more than 4 years, deferring to the Navajo Tribe approval of the plan. UNC alleges that tribal approval for mining plans on lands leased by an Indian tribe was not required or authorized by statute, regulation, or the lease agreements.

On either April 4 or April 7, 1978,[8] a meeting took place between UNC and Interior Department officials. At this meeting, UNC was informed that the Department of the Interior was giving the Navajo Tribe a veto power over the mining plan and that the Department and USGS were refusing to take any action on the mining plan until the Tribe approved it.

Upon learning of the Department of the Interior's imposition of the requirement of Navajo Tribe approval, UNC made repeated and continuous efforts to gain such tribal approval. In addition, UNC sought to convince the Secretary to withdraw the requirement of tribal approval of the mining plan.

On July 6, 1981, one day before its leases were to expire, UNC filed a civil action[9] in the United States District Court for the District of Columbia against the Secretary of the Interior seeking a declaratory judgment that the Secretary had wrongfully failed to approve or otherwise timely act on the mining plan. UNC also sought injunctive relief to extend the term of the leases and to require the Secretary to act promptly on UNC's mining plan and to prevent the Secretary from approving any other leases, contracts, or agreements for mineral rights pertaining to the leases in question.

Judge Harold H. Greene in a memorandum order dated May 31, 1982, stated that "[t]he Secretary refused to approve the plan because the Navajo Tribe had not given its approval, although tribal approval is apparently not required by statute, regulation, or the leases themselves."[10] However, Judge Greene ruled that UNC was required to join the Navajo Tribe as an indispensable party as the Tribe was the actual lessor of the land. UNC was unable to join the Navajo Tribe, which successfully raised the defense of sovereign immunity.[11]

UNC never received approval of the mining plan and on July 7, 1981, UNC's leases expired as a result of their failure to institute mining operations.

On May 4, 1984, UNC filed its complaint in the United States Claims Court alleging that the Department of the Interior's failure to approve the mining plan constituted a taking of property without just compensation in violation of the Fifth Amendment to the Constitution of the United States. UNC seeks compensation in the amount of sixty-five million ($65,000,000) dollars, which it asserts, is equal to the fair market value of its interests in the leases at the time of the alleged taking, and an additional amount equal to the compound interest accrued on that amount since the time of the alleged taking.

### Discussion

The United States, in its motion before this Court, contends that: (1) UNC's claim

7.  See 25 C.F.R. § 177.4 (1977), Technical Examination of Prospective Surface Exploration and Mining Operations, and 25 C.F.R. § 177.7 (1977), Approval of Mining Plan.

8.  April 7, 1978, was stated as the date of the meeting in plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss filed with the United States District Court for the District of Columbia. Civil Action No. 81–1537. April 4, 1978, was the date stated by Arthur W. Woods in an affidavit signed June 23, 1981.

9.  See United Nuclear Corp. v. James G. Watt, No. 81–1537, Memorandum Order (D.D.C. May 31, 1982).

10.  Id., Memorandum Order at 1.

11.  In United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1977), the Supreme Court stated:

> The powers of Indian tribes are, in general, "inherent powers of a limited sovereignty which has never been extinguished." F. Cohen, Handbook of Federal Indian Law, 122 (1945) (emphasis in original). * * *
> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers.

is barred by the statute of limitations under 28 U.S.C. § 2501; (2) the allegations contained in the complaint do not constitute a taking of UNC's property in violation of the Fifth Amendment; (3) the complaint fails to state a claim upon which relief can be granted; and (4) this Court lacks jurisdiction over the subject matter.

Taking defendant's arguments as they were presented chronologically, the Court will first address the question of whether UNC's claim is barred by the statute of limitations.

*A. Statute of Limitations.*

■ Rule 8(c) RUSCC provides that a statute of limitations defense is an affirmative defense. A motion to dismiss based upon an affirmative defense is to be resolved by summary judgment standards if it relies upon matters outside the pleadings. 5 Wright and Miller, *Federal Practice and Procedure:* Civil § 1366 at p. 683–84 (1969).[12]

This action was commenced on May 4, 1984. 28 U.S.C. § 2501 states that an action in the United States Claims Court must be "filed within six years after such claim first accrues." It is a well settled principle that the Claims Court's statute of limitations is jurisdictional, 28 U.S.C. § 2501; *Parker v. United States*, 2 Cl.Ct. 399, 402 (1983), and cannot be waived by the Court. *Parker*, 2 Cl. Ct. at 402; *Todd v. United States*, 155 Ct.Cl. 87, 93, 292 F.2d 841, 844 (1961).

In the instant case, the defendant argues that UNC's claim accrued on either April 4 or April 7, 1978, the date that UNC was informed by officials of the Department of the Interior that the Department had given the Navajo Tribe complete veto power over the mining plan and that no action would be taken on the mining plan by the Department and USGS until the tribe approved it. Defendant contends that it was obvious to UNC at that time that if the position of the Secretary did not change, then inevitably UNC's lease term would expire without its being able to conduct any mining operations on the subject lands and thereby produce paying quantities of minerals which would warrant an extension of the original 10–year term. Therefore, defendant reasons that the statute of limitations expired on either April 4 or April 7, 1984, approximately one month before UNC filed its complaint.

UNC opposes defendant's position and argues that its claim accrued on or about January 1, 1979, a date within the statute of limitations. UNC presented affidavits stating that it had to commence mining operations by January 1, 1979, in order to produce minerals in paying quantities within 10 years after the leases became effective. UNC contends that the taking of its mineral leases occurred as a result of the Secretary's imposition of the requirement of tribal approval of the mining plan yet did not accrue until the Navajo Tribe had refused or otherwise failed to give such approval. UNC asserts that had its repeated and continuous efforts to obtain tribal approval been successful, it would have been able to develop its leases. However, the Tribe never granted its approval.

In *Sauer v. United States*, 173 Ct.Cl. 642, 647, 354 F.2d 302, 304 (1965), the Court of Claims stated that "[a] claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Quoting *Oceanic Steamship Co. v. United States*, 165 Ct.Cl. 217, 225 (1964).

In the case at hand, it is undisputed that the Department of the Interior, despite what was indicated to UNC at the April 1978 meeting, could have approved UNC's mining plan pursuant to its authority under 25 U.S.C. § 396a and 25 C.F.R. § 177.7, at any time subsequent to the meeting. No formal disapproval was ever transmitted to UNC, either verbally or in writing. Further, the Navajo Tribe could have subse-

---

12. Also *see* footnotes 1 and 2 for a discussion of Rule 12(b) RUSCC and Rule 56 RUSCC which provide for the conversion of a motion to dismiss into a motion for summary judgment. On the question of the statute of limitations, matters outside the pleadings in the form of affidavits were presented to and allowed by the Court.

quently given its approval of the mining plan although the plan would still require final approval of the Department of the Interior.

In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court was presented with the question whether the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, together with certain regulations promulgated under its authority by the Army Corps of Engineers, authorized the Corps to require landowners to obtain permits from the Corps before discharging fill material into wetlands adjacent to navigable bodies of water and their tributaries.

In addressing the issue of when a "taking" has occurred, the Court stated:

A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. *Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.* [Emphasis added.]

*Id.* 106 S.Ct. at 459.

Therefore, in order to determine the date on which the statute began to run, this Court must further analyze UNC's contention that it was necessary to begin mining operations on January 1, 1979, in order to extend the term of the leases.

Although not cited by either party, the Court finds *Nitol v. United States*, 7 Cl.Ct. 405 (1985), to be persuasive in seeking to determine the date on which the statute of limitations began to run. In *Nitol*, (1985), plaintiffs, property owners in the Marshall Islands, brought actions in September 1981 to recover for losses sustained as the result of nuclear testing in the Marshall Islands. Plaintiffs alleged that nuclear fallout from the United States nuclear testing program in the Marshall Islands from 1946 to 1958

contaminated their property resulting in an unlawful taking of their property. Defendant moved to dismiss the complaint on grounds that the action was barred by the statute of limitations, stating that, if, in fact, there was a taking, it occurred by 1962 at the latest, since after 1962, no further actions were taken by the United States which contributed to the radiation danger.

In denying the defendant's motion to dismiss, the Court stated:

A claim for just compensation in a taking case by inverse condemnation is uniquely fact-intensive. Denial of a taking claim on the basis of the defense of limitations is warranted only where the facts alleged demonstrate conclusively that such decision is required as a matter of law. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983). Defendant's motion to dismiss in these cases, insofar as based on the bar of limitations, raises factual issues that involve both the nature and extent of the alleged taking and the time when plaintiffs should have been on inquiry that their claims had accrued.

*Nitol*, 7 Cl.Ct. at 413.

■ As in *Nitol*, defendant's motion, insofar as based on the statute of limitations, raises factual issues brought to light by plaintiff's affidavit testimony as to "the nature * * * of the alleged taking and the time when plaintiff[s] should have been on inquiry that [its] claims had accrued." *Id.*

Accordingly, defendant's motion to dismiss based upon the statute of limitations is denied.

### B. Subject Matter Jurisdiction.

■ In the alternative, defendant argues that if the Court adopts UNC's claim that the taking occurred on January 1, 1979, due to the failure of the Navajo Tribe to approve the mining plan, then this Court lacks subject matter jurisdiction on grounds that the "taker" is not the United States, but rather the Navajo Tribe.

However, in *Langenegger v. United States*, 756 F.2d 1565, 1570 (1985), the Unit-

ed States Court of Appeals for the Federal Circuit noted that "[a] taking can occur simply when the Government by its actions deprives the owner of all or most of his interest in his property," and "there can be a taking if the Government makes it possible for someone else to obtain the use or benefit of another person's property." Quoting *Aris Gloves, Inc. v. United States,* 190 Ct.Cl. 367, 374, 420 F.2d 1386, 1391 (1970). "Thus, it is the loss to the owner of the property and not the accretion to the Government which is controlling in fifth amendment cases." *Aris Gloves, Inc.,* 190 Ct.Cl. at 374, 375, 420 F.2d at 1386. Citing *United States v. Causby,* 328 U.S. 256, 261, 66 S.Ct. 1062, 1065, 90 L.Ed.2d 1206 (1946); *R.J. Widen Co. v. United States,* 174 Ct.Cl. 1020, 1028, 357 F.2d 988, 993 (1966); *Eyherabide v. United States,* 170 Ct. Cl. 598, 606, 345 F.2d 565, 570 (1965).

Further, the Court in *Langenegger,* 756 F.2d at 1570, observed that "[t]he United States may be held responsible for a taking even when its action is not the final direct cause of the property loss or damage," and stated that *"the focus is not on the acts of others, but on whether sufficient direct and substantial United States involvement exists."* (Emphasis in original.) *Id.* at 1571.

In order to determine whether the actions of the United States were sufficiently direct and constituted substantial involvement, the Court in *Langenegger* looked to the "sum of two factors: (1) the nature of the United States' activity, and (2) the level of the benefit the United States has derived." *Id.* at 1572.

It is clear that the actions of the defendant were regulatory in nature. 25 C.F.R. § 177.7(a) requires that mining operators must file a mining plan with the USGS and receive approval before beginning operations. Accordingly, 25 C.F.R. § 177.7(e) states that:

> The mining supervisor shall review the mining plan * * * and shall promptly indicate to the operator any changes, additions, or amendments necessary to meet the requirements formulated pursu-

ant to § 177.4, the provisions of these regulations and the terms of the permit or lease.

In contradiction to 25 C.F.R. § 177.7(e), the defendant failed to act promptly in any way with regard to the mining plan, and its delegation of approval of the plan to the Navajo Tribe does not reduce the nature of the government's involvement.

Although the *Langenegger* case dealt with interpretation of the Just Compensation Clause where there was involvement by a foreign government, its principles are not inapposite in this case, especially in light of the fact that the Navajo Indian Tribe is regarded as a quasi-sovereign nation.[13]

As a further argument, defendant states that if this Court finds that UNC's claim is founded upon an express or implied contract, then the Court lacks jurisdiction over the claim because it is based upon a contract made with someone other than the United States. In support of this argument, defendant cites *United States v. Algoma Lumber Co.,* 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260 (1939), a case in which the Supreme Court, in considering a suit brought in the Court of Claims to recover alleged overpayments made by a lumber company for timber from unallotted Indian lands under contract with the Klamath Tribe, held that the contracts were not those of the United States. The Court reasoned this was so even though the sale was made under regulations, with the approval of the Secretary of Interior, and the proceeds were deposited in the United States Treasury to be held and used by the Secretary for the use and benefit of the Indians. As they were not contracts of the United States, the Court of Claims was without jurisdiction to permit recovery.

However, UNC's complaint in this case contains no statements indicating that it is proceeding in any way upon a contract theory of recovery. Rather, plaintiff's complaint clearly states that "this is an action in inverse condemnation" and alleges that " * * * the Department of the Inte-

---

**13.** *See* footnote 11, *supra.*

rior, has deprived UNC of UNC's interest in mineral leases." UNC further alleges that "the deprivation constitutes a taking without just compensation in violation of the Fifth Amendment to the Constitution of the United States."

For the reasons set forth above, the Court denies the defendant's motion on the alternative ground that the Navajo Tribe is the "taker" and that the Court lacks jurisdiction to entertain such a claim.

### C. Summary Judgment (failure to state a claim which constitutes a taking).[14]

■ Defendant argues that UNC's complaint fails to allege any acts which constitute a taking of plaintiff's property in violation of the Fifth Amendment and claims that there are no material facts in dispute, and defendant is entitled to summary judgment as a matter of law.

A motion for summary judgment under Rule 56 of the Rules of the United States Claims Court shall be granted where it appears from the pleadings that there is no genuine issue as to any material fact and that such facts entitle the moving party to a judgment as a matter of law. RUSCC 56(c); *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed.Cir.1984). Summary judgment may not be granted where there are disputed material factual issues which can only be resolved by trial on the merits. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884 (Fed.Cir.1983); *Niagara Mohawk Power Corp. v. United States,* 207 Ct.Cl. 576, 583, 525 F.2d 1380, 1385 (1975). The party seeking summary judgment has the burden of showing that there is no genuine issue of material fact. All inferences must be viewed in the light most favorable to the party opposing the motion. *Adickes v. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

Defendant relies upon *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002 (1967), in its argument. In *Eastport,* the Court denied a claim under 28 U.S.C. § 1491 based upon a failure of a government agency to act in the course of its regulatory function resulting in a monetary loss to the claimant. Plaintiff purchased a surplus vessel from the U.S. Maritime Commission which imposed the condition that any future sale of the vessel to a foreign purchaser by plaintiff would require the approval of the Commission as authorized by statute. After operating the vessel unprofitably for several years, plaintiff entered into a contract with a foreign buyer subject to plaintiff obtaining Commission approval within 3 months. Whereupon, plaintiff promptly applied to the Commission for sale approval and made known to the Commission its need to have its request disposed of within the time limit set forth in the contract. The Commission failed to act on the request to approve the sale within the allotted time and the foreign buyer terminated the agreement. Later, plaintiff found another foreign buyer at a much lower price than that offered by the first purchaser. On this occasion the Commission timely approved the sale. Plaintiff then sued for the difference between the two contracts alleging that the Commission's failure to approve the first contract gave rise to a taking.

Upon determining that the alleged "taking" was noncontractual and therefore no breach of contract existed, the Court then examined the pertinent provisions of the Shipping Act to determine whether that statute expressly or impliedly granted plaintiff compensation for the business loss it incurred.

The Court concluded that the statute was simply a regulatory measure comparable to many other permission or license granting statutes. In this regard the Court said:

> There is not one word in the text suggesting that the United States will compensate an applicant who suffers a business loss because of the Commission's improper failure to grant the request * * *.

---

**14.** Defendant's arguments that the allegations contained in the complaint do not constitute a "taking" of UNC's property in violation of the Fifth Amendment and that the complaint fails to state a claim upon which relief can be granted are considered together.

There is no decision of this or any other federal court holding or intimating that the United States will be liable under the Tucker Act for such a commercial injury resulting from a failure or wrong done in the regulatory process. *Eastport*, 372 F.2d 1009.

The Court concluded further that there was no taking under the Fifth Amendment since neither the plaintiff's ship nor its contract with the first foreign buyer was appropriated.

UNC, in opposition to defendant's argument, asserts that its mineral leases constitute "property" for which just compensation must be paid if taken in violation of the Fifth Amendment. In support of its claim, UNC cites *Hamilton Bank of Johnson City v. Williamson County Regional Planning Commission*, 729 F.2d 402, 405 (6th Cir.1984), for the proposition that it has become a universally-accepted rule that governmental regulatory activity, even without physical occupation of property may effect a taking. *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 568 (1958).

In *Hamilton Bank* developers had received approval from the county planning commission for a residential development. With that approval in hand, the developers spent several million dollars for improvements to the property. But when the plans were submitted for renewal, the planning commission turned them down, asserting that new regulations adopted subsequent to the initial approval had not been satisfied. However, the application of those new regulations to the developers' plan was found to have been unlawful.

The Sixth Circuit held that a taking under the Fifth Amendment had occurred. It noted that "[t]he Supreme Court has not set forth a clear standard by which to determine whether particular conduct amounts to a 'taking' under the fifth amendment", and that "[r]esolving this question generally requires an ad hoc, factual inquiry." *Hamilton Bank*, 729 F.2d at 405, *citing, inter alia, Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982); *Kaiser Aetna v. United States*, 444 U.S. 164, 174–175, 100 S.Ct. 383, 389–390, 62 L.Ed.2d 332 (1979); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The Court identified two key issues to determine whether the facts before it gave rise to a taking. First, it was necessary that the Government's failure to approve the development plans did not merely diminish the value of the property, but rendered it economically unviable. *Hamilton Bank*, 729 F.2d at 405–06. Second, the Court examined whether the Government had interfered with any investment-backed expectations of the developers. The Court concluded that the Government had done precisely that:

> Even if [the developers] had not had a vested right under state law to finish the development, its claim that a taking occurred would not necessarily be foreclosed. Instead of looking to see whether "rights" have been destroyed, the Supreme Court in zoning cases has engaged in an economic analysis of the degree of interference with "investment-backed expectations." "The economic impact of the regulations, especially the degree of interference with investment-backed expectations, is of particular significance." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). *See also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 130 & n. 27, 98 S.Ct. 2646, 2662 & n. 27, 57 L.Ed.2d 631 (1978). The jury was entitled to find that [the developers] had a reasonable expectation that the development could be completed, in light of the evidence that the commission approved the preliminary plats on numerous occasions with the knowledge that a total of 736 units were intended. This was the developers' "primary expectation concerning the use of the parcel," *Penn Central*, 438 U.S. at

130, 98 S.Ct. at 2662, and was backed by considerable investment in land and improvements.

*Hamilton Bank,* 729 F.2d at 407.

Respecting the parties' arguments, this Court takes guidance in determining whether or not a compensable constitutional "taking" has occurred by applying the analysis set forth in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). In *Connolly,* the Supreme Court has stated:

> In all of these cases, we have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case. [*Ruckelshaus v.*] *Monsanto Co., supra,* 467 U.S. [986], at ——, 104 S.Ct. [2862], at —— [81 L.Ed.2d 815 (1984)]; *Kaiser Aetna, supra,* 444 U.S., at 175, 100 S.Ct., at 390. To aid in this determination, however, we have identified three factors which have "particular significance:" (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central Transportation Co., supra,* 438 U.S., at 124, 98 S.Ct. at 2659. *Accord Monsanto Co., supra,* at ——, 104 S.Ct., at ——; *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 82–83, 100 S.Ct. 2035, 2041–42, 64 L.Ed.2d 741 (1980).

In applying the analysis suggested in *Connolly,* there is an underlying question of reasonableness implicit in each inquiry. A determination of reasonableness is based upon weighing factual issues, and what is reasonable in a given set of circumstances is an issue of fact. *Hendricks v. United States,* 10 Cl.Ct. 703, 706 (1986), *citing Chernick v. United States,* 178 Ct.Cl. 498, 504, 372 F.2d 492, 496 (1967).

Under *Connolly,* the Court is first required to inquire into the economic impact of the regulation on the claimant.

The Court of Appeals for the Federal Circuit in *Florida Rock Industries v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986), gave guidance to this Court in assessing economic impact by stating:

> There is no fixed formula to determine how much diminution in market value is allowable without the fifth amendment coming into play. We are not cited to, nor have we found, cases comparing the owner's investment or basis with the market value subject to the regulation and applying any rule or formula with respect thereto, *but we deem that a relevant consideration for exercise of a value judgment.* [Emphasis added.]

Value judgments are properly made by ascertaining and weighing facts. Value judgments should be made by a trial court only when all of the facts are ventilated and developed. Such is not the case in the matter presently before the Court. In addressing the reasonableness of the Government's action in requiring Navajo approval of the mining plan, as well as the reasonableness of plaintiff's action in expending large sums of money for exploration, the Court must, of necessity, weigh testimony, listen to experts, and view the witnesses under cross-examination in order to form the factual basis for the exercise of a valid value judgment with regard to a possible "taking."

In the case before the Court, the economic impact of the regulation on UNC appears facially to be severe. The Court believes, however, that it should conduct a further inquiry regarding mitigating factors such as:

(1) What amount was actually expended for exploratory purposes;

(2) Was this amount excessive under the circumstances;

(3) Was UNC able to profit in any manner from this exploration such that its expenses were offset;

(4) Were there other viable uses of the property or other minerals which could have been mined profitably; and

(5) Whether UNC explored the possibility of assigning its interest in the lease or subleasing the lands.

These factors involve additional factual determinations which strike at the essence of potential damages and whether or not such diminution goes to the magnitude of severity necessary to meet "the severity of the economic impact test" set forth in *Connolly.*

The second suggested inquiry in *Connolly* is whether the activity interfered with a distinct investment-backed expectation. This also implies a concept of reasonableness and fairness.

The U.S. Claims Court has previously focused on reasonable investment-backed expectations as "a concept of fundamental justice and fair play, [which] suggests that even valid regulatory action can result in a taking if government shifts too heavy a burden upon a few individuals, and does so in a sudden and unanticipated manner so that those adversely affected have little opportunity to protect themselves in the market place." *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 242 (1983), *aff'd,* 765 F.2d 159 (Fed.Cir.1985). Defendant's actions in denying approval of the mining plan, the effect upon the plaintiff as compared to others in similar circumstances, and whether there was opportunity provided for the plaintiff to protect itself by seeking to mitigate its damages, are all issues which need to be further developed.

Chief Judge Kozinski in *Shanghai Power,* 4 Cl.Ct. at 242, 243, specifically enumerated a number of determinations based upon a factual analysis which are relevant to whether or not a "taking" has occurred. These include:

* * * the degree to which the property owner's rights were impaired, the extent to which the property owner is an incidental beneficiary of the governmental action, the importance of the public interest to be served, whether the exercise of governmental power can be characterized as novel and unexpected or falling within traditional boundaries, and whether the action substituted any rights or remedies for those that it destroyed. In

determining whether a taking has occurred the court must weigh all of the relevant factors and decide whether compensation is required by principles of justice and fair play. *See Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979); *Deltona Corp.,* 657 F.2d [1184] at 1191, 228 Ct.Cl. [476] at 488 [1981]. (Footnotes omitted.)

The third inquiry in the *Connolly* analysis involves the character of the governmental action. In the present case, the Government neither permanently nor physically appropriated the plaintiff's property for its own or public use. Rather the Government decided to defer approval of the mining plan to the Navajo Tribe, which, along with the Government, never acted on the plan. The action of the Government was regulatory in nature. The Court is charged with assessing the character of the Government action in identifying a regulatory taking by a "weighing of the private and public interest," *Florida Rock Industries, Inc.,* 791 F.2d at 904, which also implies a concept of reasonable conduct. *See* Chief Judge Kozinski's analysis in *Shanghai Power, supra.*

The general rule for granting summary judgment motions in "taking" clause cases is set forth succinctly by my colleague, Judge Yock, in *Anchor Estates, Inc. v. United States,* 9 Cl.Ct. 618, 621 (1986):

As a general rule, caution must be exercised in a decision to grant a motion for summary judgment. The Court of Appeals for the Federal Circuit has held that:

Though speedy and inexpensive, summary judgment is nonetheless a "lethal weapon" capable of "overkill." *Brunswick v. Vineberg,* 370 F.2d 605, 612 (5th Cir.1967). *See generally,* Louis, *Federal Summary Judgment Doctrine: A Critical Analysis,* 83 Yale L.Rev. 745 (1974). It denies the non-movant its "day", i.e. a trial, in court. Moreover, experience has shown that a trial often establishes facts and inferences not gleanable from papers submitted pre-trial.

**56**

*SRI International v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed.Cir.1985).

More specifically, the Federal Circuit has urged this Court to be very cautious when asked to grant summary judgments in taking cases. The court has stated:

> The fact-intensive nature of just compensation jurisprudence to date, however disorienting in other contexts, argues against precipitous grants of summary judgment. There may well be just compensation cases in which the United States as the moving party is "entitled to judgment as a matter of law, and where it is quite clear what the truth is * * *." *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). There may be such cases. This is not one of them.

> \*    \*    \*    \*    \*    \*

> The grant of summary judgment where a trial would be fruitless and the moving party is clearly entitled to judgment as a matter of law serves an exemplary role in the judicial process. Because the remedy can be harsh in its finality, however, its application must be accompanied by great care in respect of the entire record and the relevant law.

*Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887, 891 (Fed.Cir.1983).

After an application of the known facts in the instant case to the law, the Court concludes there is insufficient evidence in the record, without further inquiry, to permit the Court to apply the required test under *Connolly.* Moreover, when all inferences are drawn from the facts in the record in a light most favorable to plaintiff, and the *Connolly* standard is applied to those inferences, the defendant has not provided a sufficient showing at this stage to support its position that summary judgment is appropriate.

In addition, the Court concludes there are genuine issues of material fact, and that defendant is not entitled to summary judgment as a matter of law. A trial will most probably establish "facts and inferences not gleanable from papers submitted pre-trial." *SRI International,* 775 F.2d at 1116.

### Conclusion

Accordingly, the defendant's motion for dismissal/summary judgment is denied.

The parties are directed to appear before the undersigned Judge at the National Courts Building, 717 Madison Place, N.W., Washington, D.C., on Wednesday, March 25, 1987, at 12:00 p.m., or on an alternative mutually agreeable date, but no later than April 8, 1987, to discuss further the status of the case and to set a schedule for the trial of this matter.

IT IS SO ORDERED.

