NICHOLS, Senior Circuit Judge.
 

 This case, an appeal from a grant of summary judgment and dismissal of a complaint, primarily presents a novel, narrow issue: whether the United States is respon
 
 *1567
 
 sible under the Just Compensation Clause of the Fifth Amendment for the expropriation of a United States citizen’s property in a foreign land when the taking was mandated by a foreign sovereign’s legislation passed at the prompting of the United States, and hemispheric stability is an ultimate benefit hoped for by the United States, but the immediate benefit inures to natives of the expropriating nation. Appellants alleged such a taking in Counts I and II of their complaint below; alternatively they alleged that the United States is responsible under the fifth amendment for extinguishing their claim under international law (Count V). The Claims Court, Kozinski,
 
 C.J.,
 
 held that the actions of the United States and its derived benefit did not amount to a taking, as a matter of law.
 
 Langenegger v. United States,
 
 5 Cl.Ct. 229 (1984). We affirm as to Counts I and II and remand with directions to dismiss without prejudice as to Count V.
 

 Facts
 

 The facts developed on summary judgment and viewed in their most favorable light for claimants-appellants, are as follows: They are American citizens and residents of Kansas and New Mexico who claim ownership of a large coffee plantation of approximately 4,500 acres, known as Las Lahas, located in El Salvador. Rosa Langenegger, a Salvadoran national and the previous owner of Las Lahas, died in 1978, and appellants’ ownership is based on inheritance.
 

 The unfortunate political turmoil that has afflicted El Salvador is known to many in the United States. The 1970’s saw political violence become common there, with both leftwing and rightwing extremists pressuring the government. On October 15, 1979, Salvadoran military officers staged a coup d’etat and established a Revolutionary Junta comprised of members of the military and civilians. The new government promised economic, social, and political change, including banking, commerce, labor and human rights reform as well as agrarian reform. As a preliminary step, the Junta promulgated Decree No. 43, which prohibited transfer of agricultural lands in excess of 100 hectares (247 acres).
 

 The months that followed saw little progress in reform, and violence and demonstrations escalated. Concern grew in the United States that the government of El Salvador was in danger of collapse and that a Marxist government, similar to the then newly-formed government of Nicaragua, might result. It is undisputed and indeed well known in this country that as a matter of foreign policy the United States supports the stability of governments not antagonistic to it and that, in the case of El Salvador, the United States strongly supported the implementation of reforms as necessary to stability. Appellants assert that the level of “encouragement” is in dispute. They allege that the United States tied economic and military assistance to reform, provided financial aid for reform programs, and assisted in drafting the agrarian reform proposals by providing an expert who was under contract to the United States. If the Salvadoran government had not been amenable to United States recommendations, it could have expected a loss of financial support. For summary judgment purposes only, we take all this as true.
 

 On March 6, 1980, the government of El Salvador promulgated Decree No. 153, proposing land reforms which,
 
 inter alia,
 
 provided for expropriation of all agricultural estates over 500 hectares (1,235 acres) and conversion of these properties into cooperatives run by those who work the estates. Owners of the estates were to be compensated with nonnegotiable bonds said never likely to pay off at anything like the value of the property taken. The decree was implemented in March 1980, and Las Lahas was taken. Appellants have urged the United States Government to help them obtain more, but so far have received no effective assistance.
 

 Discussion
 

 We note at the onset the procedural posture of this case. As this case is presented
 
 *1568
 
 as a review of a summary judgment, the nonmoving party is given the benefit of all presumptions, inferences, and intendments. Summary judgment is appropriate only when there is no genuine issue of relevant and material fact.
 
 Adickes v. S.H. Kress and Co.,
 
 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party undertakes the burden to show the absence of a genuine fact dispute; where the moving party prima facie succeeds in its task, it is incumbent upon the nonmoving party to show the existence of factual disputes, which it cannot do by mere assertion, as for example in unsworn pleadings. A fact dispute does not matter if it concerns irrelevant facts. 6 J. Moore, W. Taggard & J. Wicker,
 
 Moore’s Federal Practice,
 
 ¶ 56.-13[3] (2d ed. 1984). We find no genuine issue of material fact and therefore consider the application of the facts to the law.
 

 The question presented to the court in this case is both a complex and a sensitive one: it is complex as it calls upon this court to consider the jurisprudence of the Just .Compensation Clause, a jurisprudence comprised of many precedents but few concrete rules; and sensitive as the government counsels this court to act with restraint and declare the claim at issue nonjusticiable in accordance with the “political question” doctrine. We hold that the circumstances set forth do not present a taking, though this claim is subject to judicial scrutiny.
 

 I
 

 In considering the taking claims, the Claims Court concluded that “[important considerations of judicial restraint provide an independent basis for refusing to recognize a cause of action on the basis of the facts alleged by plaintiffs.”
 
 Langenegger,
 
 5 Cl.Ct. at 233. Because the case relates to the relationship between the governments of El Salvador and the United States, the court declared the claim nonjusticiable under the “political question” doctrine. We hold, however, that the political question doctrine does not mandate so sweeping a result.
 

 The seminal discussion of the political question doctrine is found in
 
 Baker v. Carr,
 
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). There the Court stated that
 

 it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. [Previous cases] show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.
 

 Id.
 
 at 211-12, 82 S.Ct. at 706-707.
 

 More recently, three factors for consideration have been presented as determinative of this issue:
 

 (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a. court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?
 

 Goldwater v. Carter,
 
 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979). (Powell,
 
 J.,
 
 concurring.)
 

 We have considered the determinative factors and find here that the doctrine does not control this case. We note as well the recent consideration given this issue by our sister circuit in
 
 Ramirez De Arellano v. Weinberger,
 
 745 F.2d 1500, 1511-15 (D.C.Cir.1984) (i
 
 n banc). Ramirez
 
 is clearly distinguishable from the case before us in two important aspects: (1) the District of Columbia Circuit considered the appropriateness of a dismissal of a complaint alleging direct United States expropriation, and (2) the relief requested was that of an injunction to be granted under the Just Compensation Clause, rather than the more mundane request for monetary compensation presented here. While we do not address the D.C. Circuit’s resolution of these issues, its consideration of the political question doctrine presents an analysis similarly appropriate to this case.
 

 
 *1569
 
 Consideration of land taking claims is clearly the role of the judiciary according to the Constitution, Amendment V, and ascertainment of “just compensation” is a judicial function,
 
 United States v. New River Collieries,
 
 262 U.S. 341, 343, 43 S.Ct. 565, 566, 67 L.Ed. 1014 (1923). The courts have traditionally considered land taking claims, and the Constitution does not provide for a foreign affairs exception. That there should be a case of perhaps admitted government taking, that the courts could not touch with whatever precaution to maintain security, is a proposition we cannot accept. Similarly, the claims before this court require no movement outside the judiciary’s traditional role. We note that this case does not require a judicial determination of El Salvador’s sovereignty or the appropriateness of its actions, as appellee contends it does; nor does the case question the executive’s authority to undertake any action. Appellants explicitly accept that El Salvador is a sovereign government recognized by the United States, that the expropriation was valid, and that by their claims appellants do not seek to question executive authority. Appellants present only a narrow issue: whether the United States’ involvement was sufficiently direct and substantial to warrant a holding that apart from the taking by El Salvador, there was a taking by the United States obligating it to pay “just compensation.”
 

 We disagree with the Claims Court’s determination that appellants claim to be damaged by the manner in which our government conducts foreign relations. Such a sweeping characterization is not mandated by the law. Nor do we find that adjudication of the claims would require discussion of sensitive and confidential communications. We note that appellee has been given opportunities to assert the “state secret” privilege and has declined to do so. Such a privilege is absolute and would protect the government from the dangers with which the Claims Court is concerned.
 
 See Northrop Corp. v. McDonnell Douglas Corp.,
 
 751 F.2d 395, 399 (D.C.Cir.1984);
 
 Moliero v. FBI,
 
 749 F.2d 815, 820-21 (D.C.Cir.1984).
 

 The courts are often presented with questions which consider congressional or executive actions and purposes, and have managed to decide eases without putting the government in a fishbowl. For example, the Court of Claims developed a “good faith effort” test to be applied to Indian taking claims, but held that it would not find a taking where Congress had made a facially or purportedly genuine effort to obtain for the Indians a fair equivalent to land lost through congressional land transactions.
 
 Three Tribes of Fort Berthold Reservation v. United States,
 
 390 F.2d 686, 182 Ct.Cl. 543 (Ct.Cl.1968). This doctrine is approved in
 
 United States v. Sioux Nation of Indians,
 
 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). The court held that the “good faith effort” standard is an objective one and cannot be shown by private conversations or even floor debates, as these indicia of ulterior motives were not proper subjects for judicial investigation.
 
 Three Affiliated Tribes of the Fort Berthold Reservation v. United States,
 
 204 Ct.Cl. 831, 833 (1974) (Nichols,
 
 J,
 
 concurring).
 
 See also United States v. O’Brien,
 
 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
 

 The Langeneggers’ claims require inquiry into the United States’ actions. These actions are to be found from the typical sources: committee reports, executive messages, and other nonsecret documents. Consideration of El Salvador’s motives for expropriation is not the central focus of a claim alleging a taking by our country. To the extent that such motivation may be pertinent, we find that the relevant facts reside in what that government “purported” to do. If the “purported” reasons for action are not the real reasons, we think the matter is not one the judicial bench can correct; a subjective determination of a government’s motive is beyond judicial inquiry.
 

 Finally, we find that prudential considerations, identified in
 
 Baker v. Carr,
 
 do not bar adjudication. Such considerations include:
 

 
 *1570
 
 [Tjhe impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 

 Baker v. Carr,
 
 369 U.S. at 217, 82 S.Ct. at 710.
 

 We note again that this is a claim of narrow focus, requiring no second-guessing of the executive branch or detailed inquiry into the ulterior motives of the two governments. While cases involving foreign affairs may make the courts uncomfortable, the Constitution mandates the role of the judiciary without regard to its comfort. A holding that a taking has occurred is in no way an attribution to the United States of reprehensible conduct. Rather, the assumption is that Congress has provided the safety net of the Tucker Act, 28 U.S.C. § 1491, to make sure that its actions will meet the standard of respect for property rights that the Constitution requires.
 
 Regional Rail Reorganization Cases,
 
 419 U.S. 102, 126, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974). Ultimately, the political question doctrine is rooted in concern for the separation of powers,
 
 Baker v. Carr,
 
 369 U.S. at 210, 82 S.Ct. at 706; the doctrine is one of “ ‘political questions,’ not one of ‘political cases.’ ”
 
 Id.
 
 at 217, 82 S.Ct. at 710. As this case seeks only a determination of the lawfulness of the executive’s deprivation of appellants’ private property without just compensation, it is justiciable.
 

 II
 

 The Just Compensation Clause was designed to “bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.”
 
 Armstrong v. United States,
 
 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Thus, whether a particular act by the government amounts to a taking ultimately depends in large part on the particular circumstances of the case.
 
 United States v. Central Eureka Mining Co.,
 
 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958).
 

 While interpretations of the Just Compensation Clause indeed are nebulous, especially where a foreign government’s involvement exists, several established authorities serve as useful guides. It is settled law that the United States is bound by our Constitution when it takes actions that affect citizens outside our territory,
 
 Reid v. Covert,
 
 354 U.S. 1, 5, 77 S.Ct. 1222, 1224, 1 L.Ed.2d 1148 (1957); therefore the government must provide just compensation for takings by its forces which occur abroad, when not acts of war.
 
 Seery v. United States,
 
 127 F.Supp. 601, 130 Ct.Cl. 481 (1955). It is also an accepted principle that it is not essential for the government to have taken property for its own use for a taking to be found.
 
 Hawaii Housing Authority v. Midkiff,
 
 — U.S.-, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). “A taking can occur simply when the Government by its actions deprives the owner of all or most of his interest in his property,”
 
 Aris Gloves, Inc. v. United States,
 
 420 F.2d 1386, 1391, 190 Ct.Cl. 367 (1970), and “[t]here can be a taking if the Government makes it possible for someone else to obtain the use or benefit of another person’s property.”
 
 Id.
 
 The United States may be held responsible for a taking even when its action is not the final direct cause of the property loss or damage. “[I]n any case where government action is causally related to private misconduct which leads to property
 
 damage
 
 — a
 
 determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment.” National Board of YMCA v. United States,
 
 395 U.S. 85, 93, 89 S.Ct. 1511, 1516, 23 L.Ed.2d 117 (1969) (emphasis supplied).
 

 
 *1571
 
 Taken together, these precedents themselves do not preclude the appellants’ claims. There is nothing to suggest, as appellee contends, that
 
 whenever
 
 the final act of expropriation is by the hand of a foreign sovereign, the United States cannot be held responsible. When considering a possible taking,
 
 the focus is not on the acts of others, but on whether sufficient direct and substantial United States involvement exists.
 

 This court’s predecessor, the Court of Claims, previously had opportunities to consider the level of involvement necessary to hold the United States responsible for a foreign-based taking. In
 
 Turney v. United States,
 
 115 F.Supp. 457, 126 Ct.Cl. 202 (1953), the court was presented with circumstances found to be sufficient.
 
 Turney
 
 involved an embargo formally enacted by the Philippine Government. Following the post-War inception of the Republic of the Philippines, the United States Pacific Air Service Command conveyed to the Philippines certain surplus supplies found at the Leyte Air Depot. The surplus was sold, but it was discovered later that radar equipment was among the items at the depot. After the new owner, a corporation, entered into negotiations to sell the equipment to the Chinese Air Force, the United States objected to the sale on security grounds, and notified the corporation that it would repossess the radar by negotiation or seizure, with the aid of the Philippine Government. The Philippine Government, aware that the United States desired to repossess, placed an embargo upon the exportation of the radar. Ultimately, the United States received the equipment in exchange for a receipt and reservation of the right to sue for value.
 

 The Court of Claims found that the exchange amounted to a taking covered by the fifth amendment.
 

 The relations, * * * between our Government and the Philippine Government, were close. Our armed forces had just liberated the Philippines * * *. Our Government had given one hundred million dollars worth of surplus property to the Philippines, * * * and had sold the property for the account of the Philippine Government. When we requested that Government to place an embargo upon the exportation of any of the property, it, naturally, readily complied. That put irresistible pressure upon the corporation to come to terms with the United States Army * * *. We think that the taking occurred * * * when the Army officially took possession.
 

 Turney,
 
 115 F.Supp. at 463.
 

 The Court of Claims holding thus rested upon the finding that the Army’s request for the embargo was substantial, direct involvement, forcing the corporation to exchange the radar. The benefit to the United States was clear; the Army reacquired the radar it mistakenly had sold.
 

 The Court of Claims again considered the level of United States involvement necessary for a foreign-based taking in
 
 Anglo Chinese Shipping Co. v. United States,
 
 127 F.Supp. 553, 130 Ct.Cl. 361
 
 cert. denied,
 
 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955). There the Supreme Commander for the Allied Powers, commander of an association of sovereign states including the United States, directed the Imperial Japanese Government to retain a vessel, the
 
 S.S. Josephine Moller,
 
 for the purpose of laying and repairing submarine cables. The court held that the United States, by way of the Allied Powers, had not undertaken a taking. As in
 
 Turney,
 
 the court looked to the nature of the United States involvement and to the benefit secured. The court found that the Supreme Commander directed Japan to retain the ship, which Japan had seized during the conquest of Hong Kong, only because Japan was powerless to act without the approval of the Allies. Such was the condition of Japan’s surrender and the Allies’ decision to allow Japan to continue limited self-rule. Japan alone originally undertook to retain the vessel and use it in the manner later ordered; the Supreme Commander’s directive was only a necessary final approval. The court considered the Allies’ minimal involvement, and the incidental nature of
 
 *1572
 
 the benefit to the occupying powers, as controlling.
 
 See also Best v. United States,
 
 292 F.2d 274, 154 Ct.Cl. 827 (1961) (requisition by U.S. Army in occupied Germany).
 

 The Langeneggers’ claim falls within the factual situations of neither
 
 Turney, Anglo Chinese Shipping,
 
 nor
 
 Best.
 
 The method of analysis of those cases, as well as the general doctrines enunciated by the Supreme Court, however, are controlling here. These precedents clearly establish that in determining whether a taking exists where a foreign government’s actions are involved, the focus of the inquiry is the same as that undertaken in a domestic taking case: the court must consider whether the
 
 United States’
 
 involvement was sufficiently direct and substantial to warrant its responsibility under the fifth amendment.
 
 See Porter v. United States,
 
 496 F.2d 583, 591, 204 Ct.Cl. 1355 (1974),
 
 cert. denied,
 
 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). This determination of “sufficiently direct and substantial involvement” when actions of a foreign government are involved has been premised upon the sum of two factors: (1) the nature of the United States’ activity, and (2) the level of the benefit the United States has derived.
 

 Since
 
 Porter
 
 holds that in the circumstances of that case acts of the then government of the Pacific Islands Trust Territory, though controlled in the United States Department of the Interior, cannot be imputed to the United States in a Tucker Act suit under either a contract or a taking theory, acts of an independent sovereign are excluded
 
 a fortiori.
 
 Where the actual expropriation is by the hand of a foreign sovereign, the United States cannot be held responsible merely because its activity is that of “friendly” persuasion regarding general policy, common among allies, or when the sole benefit to the United States is the political stability of its neighbors. Diplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of direct and substantial involvement, however difficult refusal may be as a practical matter. Such “nebulous forms of United States influence * * * are insufficient to make defendant constructively responsible for the taking alleged.”
 
 Porter,
 
 496 F.2d at 592. Similarly, a benefit of hemispheric stability must be characterized as a benefit only incidental to the expropriation. The expropriation by the foreign sovereign’s legislation was for the benefit of that country’s national interest as perceived by the national leaders, and was not for the United States’ public benefit.
 

 If the United States is to be held liable for a taking by federal officers under the fifth amendment and 28 U.S.C. § 1491, it is also a legal requirement that the acts of the officers be authorized, expressly or by implication,
 
 Regional Rail Reorganization Cases,
 
 419 U.S. at 127, 95 S.Ct. at 350.
 

 Cases of “inverse” takings without physical invasion or ouster [by U.S. officials] are not very numerous, and when they occur, as in * * * [citing cases] this court has been careful to consider the role of Congress, and the taking, if not expressly authorized or directed by Congress, at least is a natural consequence of Congressionally approval measures.
 

 NBH Land Co. v. United States,
 
 576 F.2d 317, 319, 217 Ct.Cl. 41 (1978).
 

 This, of course, includes instances where Congress never adverted to the possibility of land invasion or acquisition per se; thus United States military flyers were held to effect a taking of rights in air space used by them, landing or taking off while on practice flights in their normal manner.
 
 United States v. Causby,
 
 328 U.S. 256, 267, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946). However, it has been held that United States officials can hardly effect a taking by measures, however drastic, they merely advocate should be taken by state or local officials,
 
 NBH Land Co., supra, De-Tom Enterprises, Inc. v. United States,
 
 552 F.2d 337, 213 Ct.Cl. 362 (1977).
 

 It is our view also that one who owns land in a foreign country looks to the laws of that country to determine his inci
 
 *1573
 
 dents of ownership including his rights in the event of expropriation. He may look also to international law if a foreigner in the expropriating country, but that is a secondary backup that does not vary the source of his primary rights.
 

 Appellants assert as an alternative claim that the United States’ “encouragement” of El Salvador extinguished appellants’ possible claim under international law; this claim extinguishment allegedly is a taking violative of the fifth amendment. The Claims Court below incorrectly held that appellants’ claim was nonjusticiable and that the extinguishment of a claim under international law cannot amount to a taking; the court relied on
 
 Shanghai Power Co. v. United States,
 
 4 Cl.Ct. 237 (1983).
 

 In
 
 Shanghai Power,
 
 the Claims Court was presented with a claim by former owners of property held by the Peoples’ Republic of China. Plaintiffs, in that case, had lost their properties when the Peoples’ Republic ascended to power and nationalized their holdings. In 1979, President Carter established diplomatic relations with the Peoples’ Republic, and the two nations settled outstanding claims of United States nationals against China as part of the normalization process. Plaintiffs claimed that by settling their claims for less than the value of the original property located in China, the United States took their property in violation of the fifth amendment.
 

 The Claims Court properly held the claims plaintiffs had against China under international law were a property right, but that a taking did not exist based on all the circumstances, and this court affirmed. We note, however, that the lower court’s
 
 Shanghai Power
 
 decision does not present an absolute rule that the extinguishment of a claim under international law can never amount to a taking. “[T]he determination must be made on the basis of ‘the particular circumstances [of each] case.’ ”
 
 Shanghai Power,
 
 4 Ct.Cl. at 242 (quoting
 
 Penn Central Transportation Co. v. New York City,
 
 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (quoting
 
 United States v. Central Eureka Mining Co.,
 
 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958)).
 

 It was actual extinguishment, absent here, that created whatever closeness there was in the
 
 Shanghai Power
 
 case. With no extinguishment, this aspect of the claim is wholly without substance. In the case before us, appellants assert that the State Department has been uncooperative and will not attempt a diplomatic settlement with El Salvador. Appellee counters that it is the appellants who are uncooperative, and that El Salvador has agreed to abide by the Caribbean Basin Economic Recovery Act, Pub.L. No. 98-67, Title II, 97 Stat. 384 (1983), and therefore to allow international arbitration to resolve this conflict, if only appellants would avail themselves of that forum. The government contends that appellants may proceed internationally without government assistance, according to the Act. As appellants have not provided evidence to the contrary, we find that the international forum is available and that the claim has not yet been extinguished. Thus the claim of appellants under Count V of their complaint must be dismissed, without prejudice. The Claims Court judgment as to Count V is vacated.
 

 Conclusion
 

 The Claim Court’s decision on Counts I and II is affirmed. Count V is vacated and the case is remanded with directions to dismiss Count V without prejudice to a new proceeding if actual extinguishment can be shown.
 

 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.