**MARVEL ENGINEERING COMPANY, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 659–86C.**

United States Claims Court.

April 7, 1988.

Mark A. Lies, II, Chicago, Ill., attorney of record for plaintiff. Robert J. Meyer and Seyfarth, Shaw, Fairweather & Geraldson, of counsel.

Joseph A. Kijewski, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. David M. Cohen, Director, Thomas W. Petersen, Asst. Director, and Jeffrey Kahn, U.S. Dept. of Agriculture, of counsel.

## ORDER

NAPIER, Judge.

On October 5, 1982, Scottville Elevator, Inc. ("Scottville") entered into a lease with plaintiff, Marvel Engineering Company, in which Scottville agreed to lease Marvel's Greene County, Illinois, grain storage facility ("Greenfield facility") for a three-year period beginning October 1, 1982, and ending September 30, 1985. The defendant was not a party to this lease.

On July 1, 1983, the Commodity Credit Corporation ("CCC"), a corporate body which is an agency and instrumentality of the United States under the Department of Agriculture, *see* 15 U.S.C. § 714, entered into Uniform Grain Storage Agreement No. A17–3–CCC1322J ("UGSA") with Scottville, in which Scottville agreed to store CCC grain at approved grain storage facilities. These approved facilities included those Scottville owned in Scottville, Illinois, as well as the one it leased from Auburn Grain Company, in Auburn, Illinois, and the Greenfield facility which it leased from the plaintiff, Marvel.

On February 13, 1985, Scottville was notified that the Greenfield facility, among others of which it had possession, had been removed from CCC's list of Approved Warehouses. On March 13, 1985, both Scottville Elevator and Auburn Grain Company ("Auburn Grain") assigned their leases, holdings and contracts to Molen Grain Company, Inc. ("Molen").[1] Thereafter, Molen applied to CCC for a UGSA successor agreement to reinstate the Greenfield facility as an approved facility.

On June 18, 1985, Molen and its affiliated entities were ordered to vacate the Auburn Grain storage facility, pursuant to an Illinois Circuit Court Order which gave possession of the Auburn facility to Molen's principal creditor. This was followed by an order from the Illinois Department of Agriculture ordering Molen to remove all grain it then had stored at the Auburn facility.

---

1. Plaintiff contends that this assignment was in violation of the lease between the plaintiff and Scottville, since Scottville had not obtained plaintiff's prior consent, as was required under paragraph 7 of the lease.

Molen, through its attorney, notified CCC of the loss of the Auburn facility and the transfer of the grain in that facility to Molen's other facilities. Some of the grain was thereafter transferred to the Greenfield facility.

In August or September of 1985, plaintiff's attorney contacted CCC and informed it that the CCC grain had to be removed[2] from the Greenfield facility.[3] Plaintiff contends that CCC refused to remove its grain. Defendant contends that removal of the grain was the warehouseman's, i.e. Molen's, responsibility and, since the grain at issue had been comingled with other grain stored by Molen, the defendant had no specific claim to any particular grain stored by Molen but only to a specific quantity of conforming quality grain. In essence, defendant contends it was not responsible to, nor could it, remove the grain. Plaintiff contends that since CCC's grain was not timely removed, plaintiff was unable to deliver possession of the Greenfield facility to a new tenant and receive rents from the new lease it would have entered into with that new tenant.

On March 10, 1986, the Illinois Circuit Court for the Seventh Judicial Circuit, terminated a November 1, 1985, Temporary Restraining Order (TRO) that had prevented Molen[4] from removing grain it had stored on property it was leasing from Marvel. That TRO was to remain in effect until an August 23, 1985, judgment of the DuPage County Circuit Court, which gave Marvel a lien on that grain, had been satisfied. Alternatively, the March 10, 1986, Order restrained and enjoined Marvel from selling or removing any of Molen's grain which was stored at plaintiff's facilities and from interfering with Molen's removal of that grain from the facilities. The March

10, 1986, Order was premised on a finding by the Court that such grain was not owned by Scottville or its successor, Molen.

On December 26, 1985, Marvel filed a complaint against CCC in the United States District Court for the Northern District of Illinois, Eastern Division, alleging that CCC was liable to Marvel for the benefit and use of the Greenfield facility and that CCC's actions constituted a taking which, in turn, deprived Marvel of the rental payments it would have received if it had been able to rent the Greenfield facility to a new tenant. The district court held that, under the facts as alleged in Marvel's Amended Complaint, the United States was the real party in interest since monetary damages claimed by Marvel in this lawsuit would ultimately be payable from the United States Treasury.[5] That Court further held that Marvel's claims "regardless of the gloss placed upon them"[6] were grounded in a contract between plaintiff and a third-party and alleged damages exceeding $10,-000. The district court held it was prevented from asserting subject matter jurisdiction and granted the Government's motion to transfer the case to the United States Claims Court.

*Discussion*

This action comes before this Court on "Defendant's Motion to Dismiss for Lack of Jurisdiction ("Motion") pursuant to Rule 12(b)(1) of this Court.

Plaintiff seeks to recover damages based on two theories: breach of an implied-in-fact contract and a Government taking without just compensation. Plaintiff claims that the defendant continued to store its grain in the plaintiff's grain storage facility after expiration of the lease that allowed for storage of that grain,

---

**2.** Plaintiff contends that its attorney also contacted Molen and informed it that Molen's grain had to be removed.

**3.** The lease with plaintiff which Molen had assumed from Scottville, expired on September 30, 1985.

**4.** The TRO had actually been issued against Scottville. Marvel claimed it applied equally to Molen as successor to Scottville.

**5.** *See* "Order" in *Marvel v. CCC*, No. 85–C–10663, United States District Court for the Northern District of Illinois, Eastern Division, September 29, 1986, at 2.

**6.** *Id.*

causing plaintiff to lose money it would have made had it been able to lease that storage facility to another lessee.

Defendant argues in its Motion that this Court is not empowered to hear this case because the contract at issue here is one implied-at-law, over which this Court does not have jurisdiction. The defendant further argues that the "taking" claim alleged in the complaint involves the actions of a private party (Scottville/Molen) and not actions of the Government.

■ Plaintiff in its "Opposition to Defendant's Motion to Dismiss For Lack of Jurisdiction" argues that because the defendant had this case transferred to this Court on its own motion, it must not now be allowed to ask for dismissal of this case by asserting that this Court lacks jurisdiction. This Court, however, must decide its own jurisdiction. It cannot have it conferred on it by any other court. *See Diamond v. United States,* 228 Ct.Cl. 493, 498, 657 F.2d 1194, 1197 (1981), *cert. denied,* 459 U.S. 831, 103 S.Ct. 70, 74 L.Ed.2d 69 (1982). The Court of Claims has stated:

> The mere transfer of the case to this court does not establish jurisdiction; we must always assess jurisdiction for ourselves. *See Berdick v. United States,* 222 Ct.Cl. 94, 99, 612 F.2d 533, 536 (1979) (vacated and modified on other grounds). Lastly, the defendant is not estopped from arguing lack of our jurisdiction because it may have urged lack of jurisdiction in the District Court based on jurisdiction here. *See Peoples Apparel Ltd. v. United States,* 226 Ct.Cl. 515, 518 n. 6 (1980).

*Marshall N. Dana Constr. Co. v. United States,* 229 Ct.Cl. 862, 865 (1982).

Title 15 of the United States Code, section 714b(c) states, in relevant part, that:

> Any suit by or against the United States as the real party in interest based upon any claim by or against the Corporation [CCC] shall be subject to the provisions of subsection (c) of this section to the same extent as though such suit were by or against the Corporation, except that (1) any such suit against the United States based upon any claim of the type

enumerated in section 1491 of Title 28 may be brought in the United States Court of Claims, and (2) no such suit against the United States may be brought in a district court unless such suit might, without regard to the provisions of sections 714 to 714p of this title, be brought in such court.

Thus, when a plaintiff's complaint claims the United States to be the real party in interest, the first exception in 15 U.S.C. § 714b(c) grants plaintiffs a choice of forums for a claim under 28 U.S.C. § 1491; but the second exception precludes a plaintiff from bringing such claims in district courts when no independent basis for jurisdiction can be shown. In the United States District Court for the Northern District of Illinois, Eastern Division, plaintiff asserted no basis for that Court's subject matter jurisdiction other than claiming the United States as the real party in interest. Moreover, 28 U.S.C. § 1346(a)(2) divests that Court of subject matter jurisdiction for contract claims against the United States exceeding $10,000. Therefore, the District Court dismissed this suit because it lacked jurisdiction. However, plaintiff now has the burden of proving that this Court is empowered to hear this action under the Tucker Act, 28 U.S.C. § 1491. In pertinent part, that statute states:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution * * * or any express or implied contract with the United States * * *.

The United States District Court in Illinois found that under the facts alleged in the complaint the United States is the real party in interest in this suit because any monetary damages awarded to the plaintiff would ultimately be payable from the United States Treasury. *See Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). The Commodity Credit Corporation and the United States are one and the same when the CCC is involved in litigation. *Stone v. United States,* 286 F.2d 56 (8th Cir.1961).

### Contract Claims

■ It is a well-established principle that the Tucker Act empowers this Court only to hear actions based on contracts with the United States that are express or implied-in-fact. *Fincke v. United States,* 230 Ct.Cl. 233, 675 F.2d 289 (1982). "It is well settled that this Court does not have jurisdiction of claims based on an alleged contract implied-in-law." *Id.* Long ago, the United States Supreme Court held that "[t]he Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could [only] be had upon a contract implied-in-law." *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). Thus, this Court's jurisdictional grant does not encompass claims founded upon contracts "based merely on equitable considerations," and thus, implied-in-law. (citations omitted.) *Hatzlachh Supply Co. v. United States,* 7 Cl.Ct. 743, 748 (1985).

Plaintiff, by virtue of having alleged this Court's jurisdiction over the instant case, has the burden of proving facts supporting each of the following requisite elements of an implied-in-fact contract: (1) a mutual intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) authority to contract on the part of the Government agent. *Pacific Gas & Electric Co. v. United States,* 3 Cl.Ct. 329, 339 (1983), *aff'd,* 738 F.2d 452 (Fed.Cir. 1984). In essence, "[p]laintiff must show an agreement based upon a meeting of the minds that can be inferred, as a fact, from the conduct of the parties under existing circumstances which manifests their tacit understanding." *Prevado Village Partnership v. United States,* 3 Cl.Ct. 219, 223–24 (1983). From the facts, as asserted by the parties, it appears that the Government trusted that all negotiations and contracting for the storage of its grain would be performed by the warehouseman (Molen) with which it had entrusted its grain. Whether the Government, by engaging in such a course of conduct, created a contractual obligation with plaintiff is unclear. Thus, the contract claim in this case teeters on the narrow issue of whether or not the

Government did, in fact, act in any way sufficient to create an implied in fact contract between itself and the plaintiff.

Plaintiff asserts that the UGSA itself provides that CCC must explicitly direct the transfer of its grain from one storage facility to another. Thus, plaintiff insists that Molen's transfer of the defendant's grain to the Greenfield facility had to have been at the command of the CCC. Plaintiff concludes that the deposit of the CCC–owned grain in the Greenfield facility, and its continued storage there, after the Government allegedly learned that Molen's lease had expired, constituted Government action affecting an acceptance and assumption of the lease by CCC, ultimately resulting in an implied-in-fact contract between plaintiff and defendant.

Whether or not the UGSA does, in fact, prohibit the warehouseman from transferring the CCC's grain without that agency's explicit direction or approval, is a question of law which must be based on analysis of the UGSA. A negative determination would be fatal to plaintiff's case, unless it could prove that CCC had, by its actions, directed the transfer, and continued storage, of its grain in the Greenfield facility.

■ Marvel insists that paragraph 11 of the UGSA, governing "Loadout and Delivery Requirements," clearly demonstrates that Molen could not have transferred the Government's grain without its approval. However, paragraph 11 does not offer the support the plaintiff requires. In pertinent part, it states:

> When requested by CCC, the warehouseman shall, unless prevented by circumstances beyond the warehouseman's control, promptly deliver the grain ordered shipped by CCC pursuant to the provisions of this section.

Rather than forbidding the transfer of its grain without CCC approval, the above provision merely requires a warehouseman to release CCC-stored grain upon demand by CCC. Plaintiff has not presented sufficient evidence to substantiate its claim that CCC, under paragraph 11 of the UGSA, must

have explicitly directed the storage of its grain in the Greenfield facility.

CCC had contracted with Molen for the handling and storage of its grain in conformity with the UGSA. Even if it is found that some provision of the UGSA prohibited the warehouseman from transferring the grain without Government approval, plaintiff still must demonstrate that Molen did, in fact, obtain the necessary CCC approval. The possibility that the warehouseman took it upon himself to transfer the grain, at the direction of the Illinois Department of Agriculture, thus breaching its contract with the Government, cannot be summarily excluded.

However, other provisions of the UGSA do indeed support the notion that the warehouseman was not permitted to move the defendant's grain without the defendant's authorization.

Paragraph 9(a) of the UGSA states that "[f]or comingled grain [which the grain at issue here was], the warehouseman shall maintain at all times in the warehouse shown on the warehouse receipts and in which such grain was originally deposited, a stock of grain equivalent at least to the quantity, class and grade," of that grain which is represented by the warehouse receipts. Thus, Molen was obligated to maintain a quantity and quality of grain the same as that represented by the warehouse receipts held by CCC in the Auburn facility, for which the defendant held warehouse receipts. The failure of the Government to join the warehouseman as a party in the district court, in order to prove that the warehouseman had moved the Government's grain on its own initiative in violation of various provisions of the UGSA, throws suspicion on the Government's claims that it had not issued loading orders allowing the grain to be moved from the Auburn facility to the Greenfield facility.

 Surprisingly, the UGSA does not anticipate the situation where the warehouseman's lease on a storage facility at which it is storing the Government's, or another's grain, expires. However, paragraph 10 of the UGSA does contemplate a situation where it suddenly becomes necessary for the warehouseman to move the CCC grain. It states in pertinent part:

 10. Responsibility for Condition

 (a) Action by Warehouseman—The warehouseman, at the warehouseman's expense, shall take all steps necessary to preserve the condition of all grain subject to the terms of this Agreement. If deterioration cannot be prevented after the warehouseman has exercised such care in receiving, storing, and conditioning as would a reasonably prudent owner, the warehouseman, at the warehouseman's expense, shall immediately notify CCC by telephone and confirmed in writing, and request that CCC promptly issue a loading order for immediate shipment of the grain involved, or authorize a transfer of any such grain from comingled to identity preserved storage.

Subsection (b) of paragraph 10 states that after CCC has received the warehouseman's initial notice as prescribed by subsection (a), CCC must "either issue a loading order to the warehouseman or authorize the warehouseman to transfer the grain from comingled to identity preserved storage." Thus, the UGSA prohibits the warehouseman from moving the Government's grain without the express authorization of CCC, *even in a case where that grain is being damaged.* Implicit in paragraph 10, above, is the notion that the Government, via the UGSA, gives the warehouseman no authority to move its grain without CCC authorization, even in a situation where the grain is at risk of being destroyed.

 In the instant case, Molen was in actual physical control of the grain, and thus, had actual knowledge of the condition of the grain and the storage facility. When Molen's lease was about to expire, it was Molen's responsibility to request the defendant to issue the necessary loading orders, for without them, Molen could not move the defendant's grain without breaching the UGSA. If Molen failed to request these loading orders and this resulted in the continued storage of the defendant's grain in the Greenfield facility after Molen's lease there had expired, then Molen is

liable for whatever damages the plaintiff can prove it is due here. However, if Molen did, in fact, request that the Government issue the loading orders and informed the Government that its lease of the Greenfield facility was about to expire, and the Government failed to issue those orders, then the Government's action, or rather, inaction, would indeed create an implied-in-fact contract between itself and the plaintiff. Which of the above scenarios actually occurred has not been proven to this Court's satisfaction by either party. It is a question of fact that must be decided at trial. The defendant's motion to dismiss should therefore be denied.

Defendant contends that this Court lacks jurisdiction over the claims asserted in the complaint. Thus, though not styled by defendant as such, this is a 12(b)(1) motion, premised on an alleged lack of subject matter jurisdiction. Once the existence of subject matter jurisdiction is challenged, the burden of establishing it always rests on the party asserting jurisdiction, i.e., the plaintiff. *See, e.g., Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507 (5th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). Dismissal may not be granted until the party asserting jurisdiction is permitted an opportunity to demonstrate that jurisdiction exists. Reasonable discovery for this purpose should be allowed and failure to permit such discovery is usually treated as reversible error. *See, e.g., Majd–Pour v. Georgiana Community Hospital*, 724 F.2d 901 (11th Cir.1984).

Jurisdictional facts are often intertwined with the merits of a claim. In the instant case whether or not an implied-in-fact contract was created goes to the merits of the claim, but is also the basis upon which this Court's jurisdiction is premised. Courts have uniformly held that in such instances the preferable practice is to assume that jurisdiction exists and proceed to determine the merits of the claim. *See, e.g., Jones v. State of Georgia*, 725 F.2d 622 (11th Cir.), *cert. denied*, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 316 (1984).

A claim should only be dismissed for lack of subject matter jurisdiction if the claim is clearly frivolous or wholly insubstantial. In *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the Supreme Court, reversing the dismissal of a claim stated:

. Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does not later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction. The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.

327 U.S. at 682–83, 66 S.Ct. at 776 (citations and footnote omitted).

In *W.R. Cooper General Contractor, Inc. v. United States*, 12 Cl.Ct. 406 (1987), *vacated and remanded*, 843 F.2d 1362 (Fed.Cir.1988), the Federal Circuit specifically addressed a motion to dismiss under Fed.R.Civ.P. 12(b)(1), reversing the Claims Court where it held that there was no Tucker Act jurisdiction for plaintiff's claim. *See* W.R. Cooper, 12 Cl.Ct. at 408–11. The Federal Circuit stated the law as follows:

In cases such as this in which a party has moved to dismiss for lack of jurisdiction, we must consider the facts alleged in the complaint to be correct. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Air Products and Chemicals, Inc. v. Reichhold Chemicals, Inc.*, 755 F.2d 1559, 1562 n. 4, 225 USPQ 121, 123 n. 4 (Fed.

Cir.), *cert. denied*, 473 U.S. 929, 106 S.Ct. 22, 87 L.Ed.2d 700 (1985). If these facts reveal any possible basis on which the non-movant might prevail, the motion must be denied. *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686.

Here the complaint alleges the following. A dispute existed between DOL and Cooper over Cooper's alleged labor violations. As a result, DOL requested that the City withhold certain payments technically owed to Garcia–Allen as the prime contractor, but actually designated to compensate Cooper for work performed. The City escrowed these funds, after which DOL secured from Garcia–Allen a release to any rights Garcia–Allen held as prime contractor in the money. Thereafter, DOL obtained the escrowed funds.

These facts raise the possibility that a contract existed, whether express or implied, obligating DOL not to take the escrowed funds until after DOL and Cooper had finally resolved the dispute over Cooper's alleged labor violations. This contract may have existed between DOL and Cooper, or it may have existed between DOL and the City as a contract intended for Cooper's benefit. Such a contract would have been sufficient to create jurisdiction in the Claims Court under the Tucker Act. 28 U.S.C. § 1491(a)(1) (1982); *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 697–98 (1980); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474, 481–82 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977).

*W.R. Cooper*, 843 F.2d at 1363–1364.

### *Government Taking*

█ In the fifth count of its complaint, plaintiff alleges that CCC's "failure and refusal to remove its grain from plaintiff's property deprived plaintiff of the benefit and use and ownership of said property and constitutes a taking by defendant and forfeiture of said property without just compensation, in violation of the Fifth Amendment to the Constitution of the United States."

In *Langenegger v. United States*, 756 F.2d 1565, 1570 (1985), the United States Court of Appeals for the Federal Circuit noted that "[a] taking can occur simply when the Government by its actions deprives the owner of all or most of his interest in his property," and "there can be a taking if the Government makes it possible for someone else to obtain the use or benefit of another person's property." (quoting *Aris Gloves, Inc. v. United States*, 190 Ct.Cl. 367, 374, 420 F.2d 1386, 1391 (1970)). "Thus, it is the loss to the owner of the property and not the accretion to the Government which is controlling in fifth amendment cases." *Aris Gloves, Inc.*, 190 Ct.Cl. at 374, 375, 420 F.2d at 1386, (citing *United States v. Causby*, 328 U.S. 256, 261, 66 S.Ct. 1062, 1065–66, 90 L.Ed. 1206 (1946)); *R.J. Widen Co. v. United States*, 174 Ct.Cl. 1020, 1028, 357 F.2d 988, 993 (1966); *Eyherabide v. United States*, 170 Ct.Cl. 598, 606, 345 F.2d 565, 570 (1965).

Further, the Court in *Langenegger*, 756 F.2d at 1570, observed that "[t]he United States may be held responsible for a taking even when its action is not the final direct cause of the property loss or damage," and stated that *"the focus is not on the acts of others, but on whether sufficient direct and substantial United States involvement exists."* (Emphasis in original.) *Id.* at 1571.

In order to determine whether the actions of the United States were sufficiently direct and constituted substantial involvement, the Court in *Langenegger* looked to the "sum of two factors: (1) the nature of the United States' activity, and (2) the level of the benefit the United States has derived." *Id.* at 1572.

The Court takes guidance in determining whether or not a compensable constitutional "taking" has occurred by applying the analysis set forth in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). In *Connolly*, the Supreme Court stated:

> In all of these cases, we have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case.

**622**

[*Ruckelshaus v.*] *Monsanto Co., supra,* 467 U.S. [986], at 1005, 104 S.Ct. [2862], at 2874 [81 L.Ed.2d 815 (1984)]; *Kaiser Aetna [v. United States], supra,* 444 U.S. [164] at 175, 100 S.Ct. [383], at 390 [62 L.Ed.2d 332 (1979)]. To aid in this determination, however, we have identified three factors which have "particular significance:" (1) "the economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Penn Central Transportation Co., [v. City of New York], supra,* 438 U.S. [104], at 124, 98 S.Ct. [2646], at 2659 [57 L.Ed.2d 631 (1978)]. *Accord Monsanto Co., supra,* [467 U.S.], at 1005, 104 S.Ct., at 2874; *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82–83, 100 S.Ct. 2035, 2041–42, 64 L.Ed.2d 741 (1980).

In applying the analysis suggested in *Connolly,* there is an underlying question of reasonableness implicit in each inquiry. A determination of reasonableness is based upon weighing factual issues, and what is reasonable in a given set of circumstances is an issue of fact. *Hendricks v. United States,* 10 Cl.Ct. 703, 706 (1986) (citing *Chernick v. United States,* 178 Ct.Cl. 498, 504, 372 F.2d 492, 496 (1967)).

In the case presently before this Court, the issues of whether or not the defendant, via the CCC, created an implied-in-fact contract between itself and the plaintiff, or took the plaintiff's property without justly compensating plaintiff, are not clearly frivolous or wholly insubstantial, but turn on questions of fact not resolvable from the pleadings before the Court.

Accordingly, defendant's motion to dismiss is denied. The parties are directed to file with the Court a joint status report setting forth a pretrial schedule. Such report shall be filed on or before April 25, 1988.

IT IS SO ORDERED.